**FRIENDS OF SANTA FE COUNTY and Jeanie Cragin, Plaintiffs,**

v.

**LAC MINERALS, INC., Pegasus Gold Corp., and Gold Fields Mining Corp., Defendants.**

**Civ. No. 94–0569 JB/LH/DJS.**

United States District Court,
D. New Mexico.

July 12, 1995.

Douglas Meiklejohn, Douglas W. Wolf, New Mexico Environmental Law Center, Santa Fe, NM, Daniel G. Cooper, San Fran-

cisco, CA, Michael R. Lozeau, San Francisco BayKeeper, San Francisco, CA, for plaintiffs.

Sarah M. Singleton, John B. Draper, R. Bruce Frederick, Montgomery & Andrews, Santa Fe, NM, Richard E. Schwartz, R. Timothy McCrum, Crowell & Moring, Washington, DC, for LAC Minerals, Inc. and Gold Fields Corp.

Larry P. Ausherman, John R. Cooney, Walter E. Stern, Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, NM, for Pegasus Gold Corp.

## MEMORANDUM OPINION

HANSEN, District Judge.

THIS MATTER comes before the Court[1] on Defendant Gold Fields Mining Corp.'s motion to dismiss counts 1–4, filed August 15, 1994 (Docket No. 12), Defendants' motion to dismiss counts 3 and 4, filed September 23, 1994 (Docket No. 23), Defendants' motion for partial summary judgment on count 1, filed November 7, 1994 (Docket No. 31), Plaintiffs' motion to strike affirmative defenses, filed November 21, 1994 (Docket No. 37), Defendants' motion for summary judgment on count 2, filed March 7, 1995 (Docket No. 145), Defendants' motion for summary judgment on count 5, filed March 7, 1995 (Docket No. 147), Defendants' (second) motion for partial summary judgment on count 1, filed March 20, 1995 (Docket No. 151), Plaintiffs' motion to strike portions of Defendants' Vandersluis Affidavit, filed May 12, 1995 (Docket No. 176), Plaintiffs' motion for partial summary judgment on counts 1 and 2 against Defendants LAC Minerals, Inc. and Pegasus Gold Corp., filed March 20, 1995 (Docket No. 153), and Plaintiffs' motion for partial summary judgment on count 3 against Defendants LAC Minerals, Inc. and Pegasus Gold Corp., filed March 20, 1995 (Docket No. 154).

Having reviewed the submissions and arguments of the parties, and having thoroughly considered the applicable law in this matter, the Court concludes, as explained below, that Defendant Gold Fields Mining Corp.'s motion to dismiss counts 1–4 is well taken and is granted; that Defendants' motion to dismiss counts 3 and 4 is granted; that Defendants' (first) motion for partial summary judgment is granted; that Plaintiffs' motion to strike Defendants' affirmative defenses is not well taken and is denied; that Defendants' motion for summary judgment on count 2 is denied; that Defendants' motion for summary judgment on count 5 is granted; that Defendants' (second) motion for partial summary judgment on count 1 is moot; that Plaintiffs' motion to strike portions of the Vandersluis affidavit is denied; that Plaintiffs' motion for partial summary judgment on counts 1 and 2 is granted in part and denied in part; and that Plaintiffs' motion for partial summary judgment on count 3 is moot.

Plaintiffs are a local environmental advocacy group and an individual member of that group. On May 25, 1994, they brought a citizen suit under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (1988 & Supp.1994) ("Clean Water Act" or "CWA"), and the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901–6992k (1988 & Supp.1994) ("RCRA"), against the past and present operators of the Cunningham Hill gold mine in the Ortiz mountains south of Santa Fe. Defendant Gold Fields Mining Corporation ("Gold Fields") owned and operated the mine until June of 1990. Defendants LAC Minerals, Incorporated ("LAC") and Pegasus Gold Corporation ("Pegasus") have owned and operated the mine through a joint venture since that time.

Plaintiffs allege that Defendants' waste pile, a byproduct of mining operations Defendants deposited in the Dolores Arroyo ("Arroyo") of Dolores Gulch, is the source of "acid mine drainage," or "AMD." *See* Pls.' 1st Am. Compl. at 1 ("When exposed to air and water, minerals in this waste oxidize and wash from the pile, creating acid mine drainage ..., a liquid of very low pH, and containing ... high concentrations of manganese, aluminum, sulfates, cadmium, copper, nickel, zinc, lead, chromium, and total dissolved solids."). The waste pile is technically known as "overburden." Overburden is the worthless layer of soil and rock which must be removed

---

1. This case was originally assigned to the Honorable Juan G. Burciaga, Senior Judge, United States District of New Mexico. Judge Burciaga died on March 5, 1995. Subsequently, this case was transferred to Judge C. LeRoy Hansen of the United States District of New Mexico.

to gain access to the ores or minerals below. In this case, the overburden measures approximately 15 million cubic yards. Plaintiffs seek an order requiring Defendants to obtain appropriate CWA and RCRA permits, to prevent acid mine drainages posing an imminent and substantial endangerment to human health and the environment, to return the overburden (i.e., to "reclaim" the mine by replacing the top layer of rock and soil), and to pay civil penalties to the United States and attorney's fees and costs.

Acid mine drainage, also referred to as acid rain discharge,

> results from the chemical reaction of sulfide minerals with oxygen in the presence of water. The principal environmental impact of AMD is the acidification of stream water to a point at which the water becomes too acidic to support most aquatic life [and, unless treated, renders water unsuitable] for use in municipal or industrial water supplies.

Dorinda G. Dallmeyer, *A New Legislative Approach for the Control of Acid Mine Drainage,* 17 Ga.L.Rev. 969, 969–70 (1983) (footnotes omitted). AMD is also associated with "an increase in the concentration of metals in the water." *Id.* at 970 (footnote omitted).

For the purposes of a motion to dismiss, the material allegations of the complaint must be accepted as true. *Franklin v. Meredith,* 386 F.2d 958, 959 (10th Cir.1967). Dismissal is appropriate only if "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The Court must construe the pleadings liberally and if any possibility of relief exists, the claims should not be dismissed. *Gas–A–Car, Inc. v. American Petrofina, Inc.,* 484 F.2d 1102, 1107 (10th Cir.1973).

This Court will grant summary judgment when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The movant carries the burden of establishing that there are no genuine issues

of material fact but may discharge its burden by showing there is an absence of evidence to support the nonmovant's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Once the movant meets its burden, the burden shifts to the nonmovant to demonstrate a genuine issue for trial on a material matter. *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). In making its summary judgment determination, the Court looks at the pleadings and documentary evidence in the light most favorable to the nonmovant, *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991), and the movant must show beyond a reasonable doubt that it is entitled to summary judgment, *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). However, once the burden shifts to the nonmovant, that party may not rest on its pleadings but must set forth specific facts showing there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553. If the nonmovant cannot make such a showing after adequate time for discovery, summary judgment is mandated. *Id.* at 322, 106 S.Ct. at 2552.

## I. DEFENDANT GOLD FIELDS' MOTION TO DISMISS COUNTS 1–4

Plaintiffs do not contest the proposition that the permitting and regulatory provisions of RCRA and the Clean Water Act apply only to present owners or operators. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 59, 108 S.Ct. 376, 382, 98 L.Ed.2d 306 (1987) (wholly past violations not redressable under the CWA's citizen suit provision); *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1159 (9th Cir. 1989) (same in RCRA context). As Gold Fields transferred its interest in the Cunningham Hill mine in 1990 to Defendants LAC and Pegasus, counts 1 through 4 should be dismissed against it.[2]

Plaintiffs argue, however, that Gold Fields might retain a present interest in the mine. Their own allegations in the complaint state

---

**2.** Count 5 is based on 42 U.S.C. § 6972(a)(1)(B), which permits suits against "past or present"

owners or operators, and so is not subject to Defendant Gold Fields' motion to dismiss.

otherwise: "Gold Fields owned and operated the Cunningham Hill mine ... until June of 1990...." Pls.' 1st Am.Compl. ¶ 26; "In June of 1990, Gold Fields transferred the property and mining rights ... to Pegasus Gold Corporation and/or the joint venture." *Id.* at ¶ 27. The Court will dismiss counts 1 through 4 against Gold Fields, but grant leave to amend their complaint should Plaintiffs discover some evidence demonstrating that Gold Fields retains any present ownership interest in the mine.[3]

## II. DEFENDANTS' MOTION TO DISMISS COUNTS 3 AND 4

■ Count 3 alleges, in salient part, that Defendants are handling or disposing of hazardous waste without a permit in violation of section 3005 of RCRA, 42 U.S.C. § 6925. Plaintiffs specifically aver that Defendants' "deposition and maintenance of the mine waste pile at the Cunningham Hill mine causes the generation and discharge to the environment of AMD. AMD is an (*sic* ) hazardous waste." Pls.' 1st Am.Compl. ¶ 52. Count 4 states procedural and substantive violations of section 3004 of RCRA, 42 U.S.C. § 6924, and is similarly dependent upon AMD's characterization as hazardous waste. Both section 6924 and 6925 are part of subtitle C of RCRA, 42 U.S.C. §§ 6921–6939e, a cradle-to-grave regulatory regime imposing command-and-control rules for the handling of hazardous substances. Defendants move to dismiss counts 3 and 4 on the grounds that AMD and the overburden pile, as wastes resulting from the extraction of ores and minerals, are exempt from regulation under subtitle C.[4]

On October 21, 1980, Congress enacted the "Bevill amendment"[5] to RCRA, temporarily exempting certain "special wastes" from subtitle C regulation:

[E]ach waste listed below shall ... be subject only to regulation under other applicable provisions of Federal or State law in lieu of [subtitle C] until at least six months after the date of submission of [an Environmental Protection Agency ("EPA") study required under 42 U.S.C. § 6982] ...:

... Solid waste from the extraction, beneficiation, and processing of ores and minerals, including phosphate rock and overburden from the mining of uranium ore.

42 U.S.C. § 6921(b)(3)(A)(ii). Recognizing that then-existing information "on the potential danger posed by mining waste is not sufficient to form the basis for legislative action," H.R.Rep. No. 1491, 94th Cong., 2d Sess. 15, *reprinted in* 1976 U.S.C.C.A.N. 6238, 6253, Congress mandated that EPA conduct a study of mining wastes, including investigation of the following factors: the sources and volumes of mining waste and present disposal practices, alternative practices and their costs, potential dangers to human health and the environment from, *inter alia,* surface runoff of leachate (defined as "any liquid ... that has percolated through or drained from hazardous waste," 40 C.F.R. § 260.10 (1994)), possibilities for the use of discarded material, and adequacy of existing state or other federal regulatory programs. 42 U.S.C. §§ 6982(f), 6982(p). Congress directed the EPA to submit its report on mining wastes to Congress by no later than October of 1983. After issuance of this report, the EPA was then required, after public notice and comment, to either promulgate subtitle C regulations governing mining waste, or determine that such regulations are unwarranted. *Id.* § 6921(b)(3)(C).

The EPA finally completed its report on December 31, 1985. The report analyzed the

---

3. The Court takes notice of Plaintiffs' motions for partial summary judgment on count 3, filed March 20, 1995, and on counts 1 and 2, filed March 21, 1995. In both motions, Plaintiffs seek summary judgment only against Defendants LAC and Pegasus, and not against Gold Fields. *See, e.g.,* Pls.' Mem.Br.Supp.Mot.Part.Summ.J. Counts 1 & 2 at 1 n. 1 ("This Motion does not seek to resolve at this time the liability of Defendant Gold Fields Inc.... for any violations of the Clean Water Act.").

4. Defendants also maintain that they received inadequate notice of suit. Due to the Court's disposition of Defendants' primary contention, the Court has not addressed this issue.

5. The amendment is named after its sponsor, Rep. Thomas Bevill (D–Ala.).

environmental effects of mining wastes produced as a result of the extraction and beneficiation (chemical treatment of extractions to separate mineral from host rock) of ores and minerals. After receiving public comment, the EPA released its Regulatory Determination for Wastes from the Extraction and Beneficiation of Ores and Minerals, 51 Fed. Reg. 24,496 (1986) ("1986 Rule").[6] The EPA determined that subtitle C controls of wastes from the extraction and beneficiation of ores and minerals are "likely to be environmentally unnecessary, technically infeasible, or economically impractical," *id.* at 24,496, and that therefore subtitle C regulation is unwarranted.

The EPA was influenced by the "high volume, low hazard" attributes of most mining wastes. The typical mining operation entails removal of large quantities of waste materials; the refined product represents a mere fraction of the raw material extracted and processed. *Id.* 24,497–98 (enormous volumes of mining waste "results from the high waste-to-product ratios associated with mining."). *See generally* Glenn C. Van Bever, *Mining Waste and the Resource Conservation and Recovery Act: An Overview,* 7 J.Min.L. & Pol'y 249, 249 (1991) ("[A]lmost eleven tons of raw material must be handled and processed to recover one ounce of gold."). In the usual case, less than 5 to 14 percent of this mine waste constitutes hazardous material. 1986 Rule at 24,498. As such, subtitle C requirements, such as capping and liner controls, would impose enormous construction costs in order to contain relatively small, and therefore less harmful, quantities of contaminants. *Id.* at 24,498–50. Less expensive techniques the mining industry already employs, such as interceptor wells, cutoff walls, or diversion channels, are more efficient at containing and remediating acidic or otherwise toxic material such as AMD. *Id.* at 24,500. The EPA also noted that most mining sites are remote from population centers and located in drier climates with minimal toxic leaching (i.e., contaminated storm runoff) and deeper groundwater reserves. *Id.* In lieu of subtitle C regulation, the EPA elected to regulate mining wastes from extraction and beneficiation under subtitle D, 42 U.S.C. §§ 6941–6949a. *Id.*

at 24,501. Subtitle D establishes environmental performance standards the EPA and the states jointly administer, and allows for greater flexibility in regulating mining on a site-specific basis. *Id.*

The resultant mining waste exemption is codified at 40 C.F.R. § 261.4(b)(7) (1994): "The following solid wastes are not hazardous wastes: ... Solid waste from the extraction, beneficiation, and processing of ores and minerals (including coal, phosphate rock and overburden from the mining of uranium ore).... " The overburden pile from the Cunningham Hill mine is solid waste from the extraction of gold. Plaintiffs' RCRA claims predicated on AMD contamination from the overburden, as alleged in counts 3 and 4, must as a consequence fail. Their arguments to the contrary are not persuasive.

Plaintiffs first argue, erroneously, that "overburden is not waste from the extraction, beneficiation, or processing of ores." Pls.' Resp.Defs.' Mot. Dismiss Counts 3 & 4 at 6. In its 1985 report to Congress, the EPA defined mine wastes subject to the Bevill amendment as "large volume waste consisting of soil or rock generated by mining operations during the process of gaining access to an ore or mineral body. The waste includes the overburden from surface mines, underground development rock, and other waste rock." EPA Report to Congress, Wastes from the Extraction and Beneficiation of Metallic Ores, Phosphate Rock, Asbestos, Overburden from Uranium Mining, and Oil Shale at D–5 (1985) ("EPA Report") (attached as an exhibit to Defs.' Reply Supp. Mot. Dismiss Counts 3 & 4). *See also Environmental Defense Fund v. E.P.A.,* 852 F.2d 1316, 1327 (D.C.Cir.1988) ("Solid waste from the extraction of ores and minerals consists of very large volumes of overburden and waste rock excavated during mining.... The structure of the Bevill amendment suggests that the term 'solid waste from the [extraction] of ores and minerals' should be interpreted in a manner consistent with large volume wastes."), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989). Overburden is exactly the type of high volume,

**6.** The EPA left for future study the regulatory focus of processing waste.

low hazard waste that the EPA deemed eligible for Bevill exemption status. 1986 Rule at 24,497–500.[7]

Plaintiffs next rely on 40 C.F.R. § 261.4(b)(3), which provides that "mining overburden returned to the mine site" is not hazardous waste. This phrase is further explained in 40 C.F.R. § 260.10: "Mining overburden returned to the mine site means any material overlying an economic mineral deposit which is removed to gain access to that deposit and *is then used for reclamation of a surface mine.*" (emphasis added). Because Defendants admittedly have not returned the overburden to the site, Plaintiffs argue that the overburden pile is not exempt from hazardous waste status pursuant to section 261.4(b)(3).

█ Section 261.4(b)(3) derived from regulations the EPA promulgated on May 19, 1980, *see Criteria for Classification of Solid Waste Disposal Facilities and Practices,* 45 Fed.Reg. 72,709, 72,712 (1980) (citing May 19, 1980 hazardous waste regulation establishing section 261.4(b)(3) exemption, at 45 Fed.Reg. 33,066 (1980)), and before enactment of the Bevill Amendment. The Bevill and other RCRA amendments of October 21, 1980 superseded these regulations. The EPA recognized that the May 19, 1980 regulations lost validity after this congressional action.

> On May 19, 1980, EPA promulgated regulations under Subtitle C of RCRA which covered, among other things, "solid waste from the extraction, beneficiation, and processing of ores and minerals," i.e., mining waste. On October 21, 1980, just before these Subtitle C regulations became effective, Congress enacted the Solid Waste Disposal Act of 1980 ... which added [42 U.S.C. § 6921(b)(3)(A)(ii) ] to RCRA. This section prohibits EPA from regulating [mining waste] until at least six months after the Agency completes and submits to Congress the studies required....

7. This regulatory history also explains why Plaintiffs' reliance on the "overburden from the mining of uranium ore" language of the exemption of 40 C.F.R. § 261.4(b)(7) and 42 U.S.C. § 6921(b)(3)(A)(ii) is misplaced. They interpret this phrase to indicate that only uranium mining overburden is exempt, and that all other types of overburden are subject to subtitle C. The regula-

1986 Rule at 24,496. *See also Identification and Listing of Hazardous Waste,* 45 Fed. Reg. 76,618 (1980) (suspending operation of May 19, 1980 subtitle C regulations due to October 21, 1980 enactment of RCRA amendments); *EDF,* 852 F.2d at 1327–28 (explaining the legislative history and the regulatory context of the Bevill amendment); John R. Jacus and Thomas E. Root, *The Emerging Federal Law of Mine Waste: Administrative, Judicial and Legislative Developments,* 26 Land & Water L.Rev. 461, 469 (1991) (noting that prior regulations were superseded by Bevill amendment).

Plaintiffs finally assert that section 261.4(b)(7) only applies to solid waste from the extraction of ores and minerals, and not solid waste from the extraction of overburden. Pls.' Resp. Defs.' Mot. Dismiss Counts 3 & 4 at 2–3. *See also id.* at 15 ("The AMD that is the subject of this lawsuit is not a Bevill waste because it does not result from the extraction of ore, rather it results from the removal of non-ore, i.e., overburden [or] the improper storage of overburden. Neither circumstance is governed by the Bevill amendment.").

Plaintiffs' interpretation of section 261.4(b)(7) is incorrect. The precise source of AMD, whether from the "extraction of ore" or the "removal of overburden," is immaterial. The EPA recognized AMD as a potentially hazardous byproduct, and nevertheless refrained from imposing subtitle C controls on mining operations. *See* EPA Report at 4–2 (acknowledging that some mine wastes "are corrosive (acidic) and others have a high potential for forming acid."); *id.* at D–1 (defining "acid drainage" as "drainage from mines and mining wastes ...; the acidity is caused by the oxidation of sulfides exposed during mining...."); 1986 Rule at 24,498 (noting that mine waste possesses the "potential for the release of acidic and toxic liquid, i.e., acid formation."). AMD, no matter what its source, is not a hazardous sub-

tory record, and principally, EPA's inclusion of many types of mine wastes in the "high volume, low hazard" category, discredits this argument. In any event, the legislative, regulatory and textual context of this phrase indicates that Congress and the EPA intended merely to clarify that uranium mining overburden is in fact exempt from subtitle C regulation.

stance or the product of mine waste within the meaning of section 261.4(b)(7). Dallmeyer, *supra* at 983 (Bevill amendment excludes AMD from the definition of hazardous mine waste).

The 1986 regulation is clear: mining overburden, as "solid waste from the extraction ... of ores and minerals ...," is exempt from subtitle C regulation. Nothing in the legislative history or regulatory record suggests that overburden must be physically returned to the mine site to retain this exemption.[8] In any event, AMD, the "subject of this lawsuit," Pls.' Resp.Defs.' Mot. Dismiss Counts 3 & 4 at 15, is undoubtedly exempt from hazardous waste status. Counts 3 and 4 are dismissed.

### III. DEFENDANTS' (FIRST) MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT 1

■ Count 1 alleges that Defendants have violated section 404 of the CWA, 33 U.S.C. § 1344, by discharging dredged or fill material into United States waters without a permit. Plaintiffs propound two factual bases for this count: first, Defendants' original disposal of overburden into the Dolores Arroyo allegedly constituted the discharge of fill material, Pls.' 1st Am.Compl. ¶ 40, and second, Defendants deposited additional fill or dredged material from the Arroyo itself after completed deposition of the overburden. *Id.* ("Defendants have discharged additional fill material on and around the waste pile, including ... dirt, gravel, buildings, pipes, and storm water diversion channels. Defendants have also dredged materials from within the Arroyo in constructing roads, ditches, ... and other structures."). Defendants move for partial summary judgment on the first factual predicate alleged in support of count 1. They argue that the regulatory definitions of "fill" or "dredged" material do not

apply to their placement of the overburden pile in the Dolores Arroyo.

Section 404 of the CWA authorizes the United States Army Corps of Engineers to issue permits for the discharge of fill or dredged material into waters of the United States. 33 U.S.C. § 1344(a), (d). The Corps defines the term "dredged material" as "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c). The overburden originated from the Cunningham Hill surface mine, and not from United States waters; the overburden is therefore not dredged material. "Fill" is defined as "any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a waterbody." *Id.* § 323.2(e). The definition expressly excludes "any pollutant discharged into the water primarily to dispose of wastes ...," *id.*, because such discharges are governed by section 402 of the CWA, 33 U.S.C. § 1342—and are under the regulatory auspices of the EPA, and not the Army Corps of Engineers. *See West Virginia Coal Ass'n v. Reilly*, 728 F.Supp. 1276, 1286–87 (S.D.W.Va.1989), *aff'd without op.,* 932 F.2d 964 (4th Cir.1991) (coal mining overburden waste deposited in stream not dredge or fill material and hence not subject to section 404).

Defendants proffer affidavits of mining supervisors and other employees to testify to the rather obvious proposition that Defendants deposited the overburden into the Arroyo for purposes of disposal, and not to "replace [the area] with dry land or [to] chang[e] the bottom elevation" of the streambed. Plaintiffs fail to respond in a legally sufficient manner to Defendants' motion, and thus partial summary judgment will be granted.

Plaintiffs argue that regardless of whether section 404 or section 402 governs, Defen-

---

8. At least two scholars are in accord.

[T]he "most noteworthy" aspect of the [section 261.4(b)(3)] exclusion is its utter redundancy: "Presumably, mining overburden is a '[s]olid waste from the extraction ... of ores', and already falls within the special waste statutory exemption/regulatory exclusion for mining wastes. If so, mining overburden—whether or not returned to the mine site—is already excluded from hazardous waste status." The

historical reasons for this redundancy are evident: the mining overburden exclusion for nonspecial wastes was adopted five months before Congress validated a "temporary" exemption for the special mining wastes.

4 William H. Rodgers, Jr., *Environmental Law: Hazardous Wastes & Substances* § 7.9 at 78 (1992) (quoting 1 J–M Stensvaag, *Hazardous Waste Law & Practice* § 6.35 at 6114 (1986)).

dants have nevertheless violated section 301, 33 U.S.C. § 1311(a). This section merely prohibits the discharge of any pollutant except in compliance with law, i.e., except in compliance with, *inter alia*, the permitting requirements of either section 402 or section 404. Defendants in this motion are specifically moving for partial summary judgment on count 1, and not count 2, which alleges a violation of section 402. Next, Plaintiffs argue that Defendants have performed other activities, after placement of the overburden, which constitutes dredge or fill efforts. But Defendants have not moved for summary judgment on this factual predicate of count 1.

■ Finally, Plaintiffs proffer a Fed. R.Civ.P. 56(f) affidavit from their counsel, who requests more time to depose Defendants' affiants and other personnel. He states, "I am not convinced ... that the sole purpose of defendants' discharge of overburden material into Dolores Gulch was waste disposal. It is possible that defendants could have considered using the overburden pile as a pad or staging area in its mining activities." Doug Wolf Aff. ¶ 6, Pls.' Resp.Defs.' Mot. Part.Summ.J. Count 1. Plaintiffs had not attempted to serve discovery requests at this time, *id.* at ¶ 5, and so fail to assert sufficient grounds to invoke Rule 56(f). Moreover, counsel's improbable speculation regarding Defendants' purpose for placement of the overburden hardly suffices to justify delayed summary adjudication. *See* 6 (Part 2) James W. Moore et al., *Moore's Federal Practice* ¶ 56.24 at 56–817 n. 39 (1988) (citing cases in which courts denied delayed summary judgment consideration because proffered factual basis was too speculative). Defendants' (first) motion for partial summary judgment on count 1 is granted.

## IV. PLAINTIFFS' MOTION TO STRIKE AFFIRMATIVE DEFENSES

■ Plaintiffs move to strike Defendants' affirmative defenses of laches, estoppel, and statute of limitations. Plaintiffs argue that the defenses of laches and estoppel may not be asserted against them because they may not generally be asserted against the government, and as private attorneys general, Plaintiffs, they argue, should be entitled to the same immunity. They also maintain that Defendants cannot, under any conceivable

set of facts, establish the requisite element of prejudice necessary to prevail on these defenses. Finally, Plaintiffs contend that their claims are timely filed under the applicable five-year limitations period governing the Clean Water Act and RCRA claims because Defendants have failed to remove the overburden from the Dolores Arroyo, and are therefore in continuing violation of those Acts.

Fed.R.Civ.P. 12(f) provides in pertinent part that a party may move to strike from any pleading any insufficient defense. Motions to strike affirmative defenses are generally disfavored. 2A James W. Moore et al., *Moore's Federal Practice* ¶ 12.21[3] at 12–210 (1993) (citing cases); *Salazar v. Furr's. Inc.,* 629 F.Supp. 1403, 1411 (D.N.M.1986) ("Motions under Rule 12(f) are viewed with disfavor and are rarely granted."). To strike a defense at this stage, its legal insufficiency must be "clearly apparent." *Cameron v. Graphic Mgmt. Assoc., Inc.,* 817 F.Supp. 19, 22 (E.D.Pa.1992) (citing *J & A Realty v. City of Asbury Park,* 763 F.Supp. 85, 87 (D.N.J. 1991)). "The Court must be convinced that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defenses succeed." *Carter–Wallace, Inc. v. Riverton Lab.,* 47 F.R.D. 366, 368 (S.D.N.Y. 1969). As the court in *United States v. Kramer,* 757 F.Supp. 397 (D.N.J.1991), explained:

> [E]ven when the defense presents a purely legal question, the courts are very reluctant to determine disputed or substantial issues of law on a motion to strike; these questions quite properly are viewed as determinable only after discovery and a hearing on the merits. [A court may therefore] strike only those defenses so legally insufficient that it is beyond cavil that defendants could not prevail upon them.

*Id.* at 409–10 (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1381 (1990)).

Plaintiffs' motion presents disputed issues of substantive law that are best resolved in a concrete factual setting. Despite Plaintiffs' arguments to the contrary, the defenses of laches and estoppel have been successfully

asserted in environmental actions. *See, e.g., Jicarilla Apache Tribe v. Andrus,* 687 F.2d 1324, 1339–40 (10th Cir.1982). Defendants argue, moreover, that they have indeed suffered prejudice as a result of Plaintiffs' delay in bringing suit. They claim that Plaintiffs initially argued, in proceedings before the New Mexico Department of the Environment, that the overburden pile should be revegetated. Defendants have done so, at considerable cost. Now Plaintiffs seek in this action to force the Defendants to remove the overburden pile. Given this possibility for prejudice, the legal issues concerning the laches and estoppel defenses are not sufficiently clear and factually framed for resolution to warrant granting a preemptive motion to strike. In addition, the possibility exists that Defendants may never move for summary judgment on these affirmative defenses, or otherwise rely upon them, once discovery is completed.

As for the statute of limitations defense, this issue is raised by Plaintiffs' motion for partial summary judgment as to counts 1 and 2 and Defendants' (second) motion for partial summary judgment on count 1. As discussed in sections VII and IX, *infra,* the issue is moot. Therefore, it need not and should not be resolved here. Plaintiffs' motion to strike is denied.

## V. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNT 2

■ Defendants contend Plaintiffs' CWA citizen suit as alleged in count 2 is barred by 33 U.S.C. § 1319(g)(6)(A)(ii) because the New Mexico Department of the Environment ("NMED") is exercising regulatory oversight pursuant to the New Mexico Water Quality Act, N.M.Stat.Ann. §§ 74–6–1 to –17 (1993). Since 1991, the NMED has compelled Defendants to remediate the site and contain acid mine discharges. Section 1319(g)(6)(A)(ii) bars citizen civil penalty actions when the state has commenced and is diligently prosecuting its own penalty action. In support of its motion, Defendants advance the following facts which Plaintiffs, for the most part, do not dispute.

The New Mexico Environmental Improvement Division ("NMEID"), the predecessor agency to the NMED, issued Discharge Plan No. 55 ("DP–55") to Gold Fields on June 21, 1979 for a term of five years. DP–55 is essentially a permit authorizing limited discharges and imposing various operating conditions. DP–55 did not initially address the overburden. On September 17, 1985, Gold Fields and various environmental groups entered into an agreement concerning the renewal and implementation of DP–55. On October 4, 1985, the NMEID approved the agreed-upon discharge plan and renewed it for another five-year term.

On August 28, 1991, the NMED requested that Pegasus investigate a potential discharge of AMD from the overburden pile. Pegasus confirmed the existence of AMD that same day. On September 16, 1991, Pegasus submitted an application for DP–55 renewal, and, at the direction of NMED officials, addressed in the application containment of the newly-discovered AMD and reclamation of the mine. At Plaintiffs' request, and after formal notice to the public, the NMED conducted open meetings on Pegasus' DP–55 renewal on January 25, 1992. Afterwards, Pegasus supplemented its application with detailed remediation and reclamation plans. On September 10, 1992, the NMED issued an administrative consent order as an interim measure mandating water quality monitoring and reporting and imposing an outstanding stipulated penalty provision. On October 8 and 9, 1992, the NMED again held public hearings on the DP–55 renewal, at which Plaintiffs presented testimony, cross-examined witnesses, and submitted proposed findings of fact. The NMED issued its final order granting renewal and modification of DP–55 on April 26, 1993.

Later, on December 16, 1993, the NMED required further modification of DP–55 to address fresh evidence of acid mine discharge downgradient of the overburden pile. In response, LAC and Pegasus submitted a modification application. They proposed capping bedrock fractures with grout, installing a groundwater pumping system, and injecting lime milk into recirculated water to neutralize the acidic discharges. After public hearings on June 20 and 22, 1994, the NMED, Plaintiffs, and LAC and Pegasus executed a stipulation approving of the proposed modification of DP–55. The NMED issued a final order pursuant to this stipulation on October 18, 1994.

Since 1991, Defendants LAC and/or Pegasus have incurred more than $2.5 million on extensive remedial efforts, including revegetation of the overburden pile and construction of lined diversion channels, interceptor walls, a french drain, a lined collection pond, a treatment facility, and monitoring wells. LAC and Pegasus continue to be subject to the remedial and monitoring obligations of DP–55.

Congress amended the Clean Water Act in 1987 to confer upon the EPA authority to pursue administrative, in addition to civil, i.e., court-imposed, sanctions. Section 1319(g) allows the Administrator of the EPA (or the Secretary of the Army in cases of violations of section 1344) to assess administrative penalties against those found in violation of the Act or any condition or limitation of a permit. Section 1319(g)(6)(A) provides in relevant part:

[A]ny violation ... *with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection,* ... shall not be the subject of a civil penalty action under [the civil penalties provision] of this section or ... [the citizen suit provision] of this title.

(emphasis added).[9]

Defendants seek to pigeonhole the DP–55 renewal and modification process into section 1319(g)(6)(A)(ii). The fit is not apt. The state must be diligently prosecuting "an action under a State law comparable to this subsection" for this citizen suit bar to apply. *Id.* "This subsection" clearly refers to subsection (g) of section 1319, or the administrative penalties subsection. To bar a citizen

civil penalty action, the state must therefore be diligently pursuing a penalties action comparable to section 1319(g). The NMED is not currently seeking penalties, administrative or otherwise.

Nevertheless, courts interpreting section 1319(g)(6)(A) have split into two camps. One line of authority holds that as long as the state has the power to seek penalties, but has exercised its regulatory discretion not to do so, a citizen suit based on the polluter's identical conduct is barred. These courts rely heavily on policy arguments. In *North & South Rivers Watershed Ass'n. Inc. v. Town of Scituate,* 949 F.2d 552 (1st Cir.1991), the Massachusetts Department of Environmental Protection issued an administrative compliance order under the state's "Clean Waters Act" against the town of Scituate. *Id.* at 553. The town expended considerable sums to bring itself into compliance. *Id.* at 554. The state elected not to assess civil or administrative penalties. *Id.* Later, private citizens sued the town under the federal CWA, seeking civil penalties and injunctive relief, based on the same discharge violations as alleged in the state's order. *Id.* The district court barred plaintiffs' CWA claims pursuant to section 1319(g)(6)(A)(ii). The First Circuit affirmed, specifically rejecting the contention that a citizen suit is barred only if the state is actively seeking to monetarily sanction an offender. *Id.* at 555–57.

The court noted that citizen suits are designed to supplement, rather than supplant, governmental enforcement action. *Id.* at 555 (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.,* 484 U.S. 49, 60, 108 S.Ct. 376, 383, 98 L.Ed.2d 306 (1987)).[10] The

---

**9.** The entire text of section 1319(g)(6)(A) is as follows:

**(A) Limitations on actions under other sections**
Action taken by the Administrator or the Secretary, as the case may be, under this [administrative penalties] subsection shall not affect or limit the Administrator's or the Secretary's authority to enforce any [other] provision of this chapter; except that any violation—
(i) with respect to which the Administrator or the Secretary has commenced and is diligently prosecuting an action under this subsection,
(ii) with respect to which a State has commenced and is diligently prosecuting an ac-

tion under a State law comparable to this subsection, or
(iii) for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable state law, as the case may be,
shall not be the subject of a civil penalty action under subsection (d) [civil penalties provision] of this section or section 1321(b) [oil or hazardous discharge provision] of this title or section 1365 [citizen suit provision] of this title.

**10.** As discussed in section I, *supra, Gwaltney* holds that wholly past violations of the Clean Water Act are not redressable in citizen suits. In

court, quite accurately, observed that the prosecution of citizen suits based on the same conduct a state agency is already addressing hinders state-fostered remedial efforts. "Duplicative actions aimed at exacting financial penalties in the name of environmental protection at a time when remedial measures are well underway do not further th[e] goal [of restoring and maintaining the 'chemical, physical, and biological integrity of the nation's waters.' 33. U.S.C. § 1251(a) ]. They are, in fact, impediments to environmental [remediation]." *Id.* at 556. The court's policy-laden analysis led it to conclude that even injunctive relief is foreclosed by a state's administrative compliance action, despite the fact that section 1319(g)(6)(A) bars only "civil penalty" actions. *Id.* at 558 ("[I]t is inconceivable to us that the section [1319(g) ] ban is only meant to extend to civil penalty actions. Surely if the limitation of civilian suits is to have any beneficial effect on enforcement of clean water legislation, the section [1319(g) ] ban must cover all civil actions.").

Other courts have followed the First Circuit's analysis and have held that administrative compliance actions, without concurrent penalty assessments, foreclose citizen suit review. *See, e.g., Sierra Club v. Colorado Ref. Co.,* 852 F.Supp. 1476, 1484 (D.Colo.1994) (state action need not entail monetary penalties to have preclusive effect); *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.,* 777 F.Supp. 173, 180 (D.Conn. 1991) (section 1319(g)(6) "bars citizen suits where a state agency conducting enforcement proceedings against the defendant has authority to assess civil penalties, regardless of whether the agency has actually assessed such penalties."), *rev'd in part on other grounds,* 989 F.2d 1305 (2d Cir.1993); *New York Coastal Fishermen's Ass'n v. New York City Dep't of Sanitation,* 772 F.Supp. 162, 165 (S.D.N.Y.1991) ("[I]t cannot be reasonably argued that only when a penalty is actually imposed that a citizen suit is precluded," characterizing such a reading as "an overly technical interpretation" that would "unnecessarily undermine state and local enforcement efforts."). *See also Arkansas*

*Wildlife Fed. v. ICI Americas, Inc.,* 29 F.3d 376, 383 (8th Cir.1994) (injunctive relief, as well as civil penalties, foreclosed by comparable state action), *cert. denied,* —— U.S. ——, 115 S.Ct. 1094, 130 L.Ed.2d 1062 (1995).

Another line of authority applies the literal terms of the statute and refuses to preclude citizen suits unless the state (or the EPA) is actively pursuing, and not merely threatening, monetary penalties. In *Washington Public Interest Research Group v. Pendleton Woolen Mills,* 11 F.3d 883 (9th Cir.1993), the Ninth Circuit held that citizen suits are not barred by section 1319(g)(6)(A) if the EPA has instituted an administrative compliance action without seeking penalties. *Id.* at 885–86. The court rejected the reasoning of the lower court and other courts of appeals which construed this section broadly for policy reasons in order to bar civil penalty suits when the state or the EPA is pursuing administrative compliance actions.

> General arguments about congressional intent . . . cannot persuade us to abandon the clear language that Congress used when it drafted the statute. The most persuasive evidence of . . . [congressional] intent is the words selected by Congress, not a court's sense of the general role of citizen suits in the enforcement of the Act.

*Id.* at 886 (internal quotation omitted). *See also Citizens for a Better Env't v. Union Oil Co.,* 861 F.Supp. 889, 906 (N.D.Cal.1994) ("[O]nly where a state has proceeded (and assessed a penalty) under a state enforcement provision comparable to 33 U.S.C. § 1319(g) is the preclusive bar triggered."); *Public Interest Research Group v. New Jersey Expressway Auth.,* 822 F.Supp. 174, 184 (D.N.J.1992) (section 1319(g) held inapplicable because, *inter alia,* "no penalties were assessed."); *Arkansas Wildlife Fed. v. Bekaert Corp.,* 791 F.Supp. 769, 775 (W.D.Ark. 1992) (same; "Congress has not provided that citizen suits are barred whenever an administrative action is underway or simply because there may be some duplication with a government proceeding."). *See also*

---

so holding, the Supreme Court expounded on the role of citizen suits in the enforcement scheme of the CWA. 484 U.S. at 60, 108 S.Ct. at 382–83. The First Circuit and other courts which inter-

pret broadly the bar of section 1319(g)(6)(A) rely on this exposition, but *Gwaltney* had nothing to do with section 1319(g) or the bar on citizen suits.

*Orange Env't. Inc. v. County of Orange,* 860 F.Supp. 1003, 1018 (S.D.N.Y.1994) (rejecting the *Scituate* holding as to injunctive relief and ruling that section 1319(g) bars only civil penalties); *Coalition for a Liveable West Side, Inc. v. New York City Dep't of Envtl. Protection,* 830 F.Supp. 194, 197 (S.D.N.Y. 1993) (same; "I find no basis for the First Circuit's redrafting of the statute.").

Section 1319(g)(6)(A)(ii) is narrowly drawn; its preclusionary effect applies only when the EPA, the Army Corp of Engineers, or a state is in the process of collecting or has already collected administrative penalties. *Compare* 33 U.S.C. § 1319(g)(6)(A)(i) (civil penalty action barred if Administrator or the Secretary has commenced and is diligently prosecuting an administrative penalty action) *with id.* § 1319(g)(6)(A)(ii) (civil penalty action barred if the state has commenced and is diligently prosecuting a comparable penalty action) *and id.* § 1319(g)(6)(A)(iii) (civil penalty action barred if either the federal government or the state has exacted penalties and its exaction is final). *See* note 9, *supra.* Congress coupled its conferral of regulatory authority to impose administrative penalties with the bar of section 1319(g)(6)(A) simply to prevent monetarily penalizing a polluter twice for the same conduct. Defendants, and many courts, wish to read more into the citizen suit bar of this subsection than exists. Although their desire is well-founded, and their policy goals are laudable, their vision cannot be reconciled with the literal terms of the statute. Defendants' motion for summary judgment on count 2 on these grounds is accordingly denied.

## VI. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNT 5

In count 5 of Plaintiffs' complaint, Plaintiffs allege that the acid mine drainage at the site constitutes an imminent and substantial endangerment to health or the environment under 42 U.S.C. § 6972(a)(1)(B). Defendants move for summary judgment on this count based on three arguments: (1) Plaintiffs are bound by a stipulation they entered in the DP–55 proceedings which prevents them from challenging the NMED–sponsored remediation program; (2) count 5 essentially seeks to relitigate the issues raised in the DP–55 proceedings, and therefore Plaintiffs are collaterally estopped from doing so; and (3) the Court should abstain from entertaining count 5.

As discussed in the previous section, Pegasus submitted an application for DP–55 renewal on September 16, 1991, and, at the direction of NMED officials, addressed containment of AMD therein. The NMED conducted open meetings on Pegasus' renewal on January 25, 1992, at Plaintiffs' request. Subsequently, Pegasus supplemented its application with detailed remediation and reclamation plans. On September 10, 1992, the NMED issued its administrative consent order. On October 8 and 9, 1992, the NMED again held public hearings on the DP–55 renewal, at which Plaintiffs presented testimony, cross-examined witnesses, and submitted proposed findings of fact. These hearings included a mine site tour. The NMED issued its final order granting renewal and modification of DP–55 on April 26, 1993.

Later, on December 16, 1993, the NMED required further modification of DP–55 to address fresh evidence of acid mine discharge. In response, LAC and Pegasus submitted a modification application containing new remediation techniques. The NMED held public hearings on June 20 and 22, 1994, again, at Plaintiffs' insistence. Plaintiffs submitted factual and expert testimony and cross-examined witnesses. Eventually, Plaintiffs requested the following conclusion of law: "Conditions 1–12 proposed by the NMED staff have a sufficient factual basis, are reasonable, and are necessary to meet the requirements of the Water Quality Act and the Water Quality Control Commission ["WQCC"] regulations."

The NMED, Plaintiffs, and LAC and Pegasus executed a stipulation approving of the proposed modification of DP–55 on September 12, 1994. This stipulation provided that the measures Defendants had proposed should be approved, and that the final order of the Secretary of the Environment should be final. The NMED issued a final order pursuant to this stipulation on October 18, 1994. The Secretary concluded that the stipulation "conforms to the evidence adduced at the public hearing, [and] is reasonable and

consistent with the intent, purposes and goals of the Water Quality Act and the WQCC Regulations...."

DP–55 imposes continuing remedial and monitoring obligations. Specifically, Defendants must conduct a quarterly review of the effectiveness of the lime milk program and the grouted interceptor wall; study and implement alternative methods of disposal and treatment of AMD collected behind the interceptor wall if its volume is larger than expected; conduct periodic sampling of groundwater in trenches; and perform more extensive remediation efforts if certain groundwater remediation levels are not achieved within two years or if the groundwater plume is larger than anticipated.

The Court will abstain from entertaining count 5. Because of this conclusion, the Court will not address whether the September 12, 1994 stipulation precludes Plaintiffs' assertion of count 5 or whether Plaintiffs are collaterally estopped.

■ Defendants maintain that this Court should abstain from adjudicating the claim alleged in count 5 by authority of *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The Supreme Court has recently elaborated on *Burford* abstention principles in *New Orleans Public Service, Inc. v. Council of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989):

> Where timely and adequate state court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) where there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*Burford* abstention is appropriate in this context. Supportive of Defendants' position is *Palumbo v. Waste Technologies Indus.,* 989 F.2d 156 (4th Cir.1993). Plaintiffs, West Virginia governmental entities, challenged various modifications by the state of Ohio

and the EPA to defendant's RCRA permit. *Id.* at 158. The Ohio EPA and the federal EPA approved the modification. *Id.* Plaintiffs appealed the federal EPA's action to the United States Environmental Appeals Board, and appealed the Ohio EPA's action to the Ohio Environmental Board of Review. *Id.* The United States Environmental Appeals Board affirmed the permit modifications, but plaintiffs declined to appeal the Board's ruling. *Id.* Instead, plaintiffs filed a federal complaint which alleged, after subsequent amendment, a RCRA section 6972(a)(1)(B) "imminent and substantial endangerment" claim, similar to Plaintiffs' count 5 at bar. *Id.*

The Fourth Circuit described plaintiffs' complaint as a "collateral attack on the permitting decisions of the federal and Ohio EPAs." *Id.* at 159. The court instructed plaintiffs that they "should have taken up these challenges with the appropriate agencies, or raised them on direct appeal from EPA permitting decisions, whether in state or federal court." *Id.* at 160. The appellate court accordingly reversed the district court's decision to review Ohio's approval of the RCRA permit modification. "To the extent that plaintiffs challenge separately the permitting decisions of the Ohio EPA, they are denied jurisdiction on *Burford* abstention grounds." *Id.* at 159.

Like Ohio, New Mexico "has taken great care to provide for specialized adjudication of its complicated environmental law scheme." *Palumbo,* 989 F.2d at 159. Decisions of the WQCC must be made in administrative adjudications with elaborate procedural safeguards—safeguards of which Plaintiffs readily availed themselves. N.M.Stat.Ann. §§ 74–6–5, –6, –7. Plaintiffs extensively participated in the DP–55 proceedings, and they could have appealed the NMED's October 18, 1994 decision. *Id.* § 74–6–7. And as was the case in *Palumbo,* Plaintiffs' assertion of count 5 is little more than an indirect collateral attack on the NMED's DP–55 adjudication and its present regulatory course. A determination by this Court that the Cunningham Hill mine site's acid mine discharges pose an imminent and substantial endangerment to health or the environment would be irreconcilable with the NMED's determination to allow Defen-

dants to proceed under DP–55. It would, in short, constitute a serious "interfer[ence] with the proceedings or orders of [a] state administrative agency[ ]" which would prove "disruptive of state efforts to establish a coherent policy." *New Orleans Pub. Serv.,* 491 U.S. at 361, 109 S.Ct. at 2514.

■ Although the *Burford* abstention doctrine provides a sound basis for deference to the NMED, an alternative doctrine is also appropriate. The common law doctrine of primary jurisdiction provides courts with flexible discretion to refer certain matters to the specialized competence of an administrative agency which, like the NMED in this case, is exercising continuing jurisdiction over those matters. Specifically, primary jurisdiction abstention is appropriate when the agency and the court entertaining Plaintiffs' claims have concurrent jurisdiction, and the claims are properly cognizable in federal court, but the court believes it prudent to decline to exercise its jurisdiction in favor of the agency's expertise.

> [T]he original case creating the doctrine (*Texas & P.R. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426 [27 S.Ct. 350, 51 L.Ed. 553] (1907)) overrode explicit and unequivocal statutory provisions allowing the courts to act initially. The principal criterion in deciding whether the doctrine is applicable is not legislative intent but usually is judicial appraisal of need or lack of need for resort to administrative judgment.

*State ex. rel. Norvell v. Arizona Pub. Serv. Co.,* 85 N.M. 165, 171, 510 P.2d 98, 104 (1973) (internal quotations omitted). "[I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Far East Conference v. United States,* 342 U.S. 570, 574 (1952). New Mexico law also recognizes the doctrine. "[T]he legislature has created the agency in order to afford a systematic method of factfinding . . . and the agency's jurisdiction should be given priority in the absence of a valid reason for judicial intervention." *Norvell,* 85 N.M. at 171, 510 P.2d at 104. The doctrine suspends "the judicial process . . . pending referral of the issues to the administrative body for its views." *Marshall v. El Paso Natural Gas Co.,* 874 F.2d 1373, 1376–77 (10th Cir.1989). *See generally Schwartzman, Inc. v. Atchison, Topeka, & Santa Fe Ry. Co.,* 857 F.Supp. 838 (D.N.M.1994) (Burciaga, J.).

■ The doctrine of primary jurisdiction may be invoked "*sua sponte* by the court. . . . [T]he doctrine exists for the proper distribution of power between judicial and administrative bodies, and not for the convenience of the parties." 2 Fed.Proc.L.Ed. § 2:320 (1994) (citations omitted). No fixed formula constrains the Court's exercise of its discretion to invoke the doctrine, as the determination is largely fact-specific. *Bradford Sch. Bus Transit v. Chicago Transit Auth.,* 537 F.2d 943, 949 (7th Cir.1976), *cert. denied,* 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977). Various factors, however, guide a judge's decision to defer to an agency in this context.

■ First, the Court should consider whether it is being called upon to decide factual issues not within the conventional experience of judges, or are instead issues of the sort that a court routinely considers. *Marshall,* 874 F.2d at 1377. Should the Court entertain Plaintiffs' RCRA claim in count 5, the Court would have to assess whether the AMD poses an imminent and substantial endangerment to human health or the environment—an inquiry which, as discussed, can only be described as second-guessing the NMED.[11] Should Plaintiffs

11. The New Mexico Water Quality Act is designed to protect "human health, animal or plant life or property . . . or the public welfare or the use of property." N.M.Stat.Ann. § 74–6–2(B). The WQCC is charged with adopting "water quality standards for surface and ground waters of the state" in order to "protect the public health or welfare, enhance the quality of water and serve the purposes of the Water Quality Act." *Id.* § 74–6–4(C). In addition, the New Mexico Secretary of the Environment must "restrain immediately" any pollution source presenting "an imminent and substantial danger to public health." *Id.* § 74–6–11(A). It seems inconceivable that the Secretary, charged with ensuring the protection of public health or welfare and restraining imminent and substantial threats, would not have taken more extreme remedial measures if any imminent and substantial danger to health or the environment exists. More likely, the NMED's requirements are commensurate to the risks involved.

prevail on count 5, the Court would then be required to fashion an appropriate order. This in turn would require evaluating whether Defendants have adequately investigated the groundwater contamination, or whether further investigation is necessary; whether the existing methods of remediation are adequate; what level of contamination is tolerable; and a myriad other technical matters. Of course, RCRA contemplates this sort of judicial review, and theoretically, the Court could receive extensive expert testimony, or appoint a special master. But such methods would represent a serious drain of judicial resources and would largely duplicate the past and present efforts of the NMED. Evaluating the proper components of such a plan is best left to the NMED, a body that is far better suited to resolve such issues by reason of "specialization, by insight gained through experience, and by more flexible procedure." *Far East Conference,* 342 U.S. at 575, 72 S.Ct. at 494. If Plaintiffs' goal is ultimate and complete remediation of the site, this goal would be achieved faster and more efficiently through the efforts of the NMED without interference from the Court.

■ Second, the Court should consider whether Defendants could be subjected to conflicting orders of both the Court and the administrative agency. Should this Court independently determine an appropriate investigatory and remediation plan, aspects of the order may contradict DP–55 and subject Defendants to conflicting obligations. One purpose of the doctrine of primary jurisdiction is to promote uniformity and harmony in the regulatory sphere the agency is entrusted to govern. *Nader v. Allegheny Airlines,* 426 U.S. 290, 303–04, 96 S.Ct. 1978, 1986–87, 48 L.Ed.2d 643 (1976); *Marshall,* 874 F.2d at 1377. This purpose would be served in this case by deferring the remedial plan to the NMED.

A third factor courts have considered in this context is whether relevant agency proceedings have actually been initiated. " 'It is axiomatic that the advisability of invoking primary jurisdiction is greatest where the issue is already before the agency.' " *Roberts v. Chemlawn Corp.,* 716 F.Supp. 364, 365–66 (N.D.Ill.1989), *quoting Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 532 F.2d 412, 420 (5th Cir.1976), *cert.*

*denied,* 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977). In this case, the NMED has already acted to ensure that Defendants investigate and contain AMD, and it continues to exercise regulatory oversight.

Fourth, courts consider whether the agency has demonstrated diligence in resolving the issue or has instead allowed the issue to languish. Administrative delay constitutes reason to retain jurisdiction. *Roberts,* 716 F.Supp. at 366; *In re "Agent Orange" Prod. Liab. Litig.,* 475 F.Supp. 928, 933 (E.D.N.Y. 1979). No such delay exists here. The record indicates that the NMED has acted with deliberate care and diligence, due in no small measure to Plaintiffs' persistent efforts.

And finally, the Court should consider the type of relief Plaintiffs request. Courts refuse to defer jurisdiction if the plaintiff is seeking damages for injury to property or person, as this is the type of relief courts routinely evaluate; however, if the plaintiff seeks injunctive relief, requiring scientific or technical expertise, the doctrine is more readily applicable. *See Ryan v. Chemlawn Corp.,* 935 F.2d 129, 131 (7th Cir.1991) (because plaintiff dropped claim for injunctive relief, lower court improperly invoked doctrine); *O'Hare v. Valley Utils., Inc.,* 89 N.M. 105, 111, 547 P.2d 1147, 1153 (Ct.App.) (injunctive relief is "identical to the relief which the agency could have granted" and therefore primary jurisdiction lies with the agency), *rev'd in part on other grounds,* 89 N.M. 262, 550 P.2d 274 (1976). Plaintiffs seek an order from the Court enjoining the discharge of acid mine drainage into the ground and surface waters of areas adjacent to the overburden pile. This is exactly the type of relief the NMED, in its expertise, considered, and, in the manner it deemed most appropriate, provided.

In summary, "[i]t would be improper for this Court to exercise its equitable jurisdiction to interfere with the comprehensive programs designed to solve a complex social, economic and technological problem. Quite simply, [the Court] choose[s] not to pollute the scene with still more studies and standards." *Norvell,* 85 N.M. at 172, 510 P.2d at 105. Summary judgment on count 5 is granted.

## VII. DEFENDANTS' (SECOND) MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT 1

In this motion, Defendants contend that the applicable statute of limitations, codified at 28 U.S.C. § 2462 and imposing a five-year limitations period, bars Plaintiffs' claim that the original placement of overburden waste, completed prior to 1987, violated section 404 of the CWA, 33 U.S.C. § 1344. As discussed in section III, *supra*, section 404 does not apply to Defendants' disposal of overburden in the Arroyo. Disposition of Defendants' (first) motion for partial summary judgment on count 1 obviates the necessity to resolve the limitations issue raised by this motion.

## VIII. PLAINTIFFS' MOTION TO STRIKE PORTIONS OF DEFENDANTS' VANDERSLUIS AFFIDAVIT

In response to Plaintiffs' motion for partial summary judgment on counts 1 and 2, analyzed in the next section, Defendants proffered the affidavit of one of their experts, George D. Vandersluis. Plaintiffs move to strike those portions of the Vandersluis affidavit that state that no hydrologic connection exists between the bedrock groundwater in the vicinity of the overburden pile and the surface water in the Arroyo.

By order dated December 29, 1994, Defendants were required to provide expert reports no later than January 31, 1995. Defendants accordingly submitted Vandersluis' report, which made no mention of a direct hydrologic connection or the lack thereof. Under the parties' December 6, 1994 discovery plan, the parties agreed that any supplementation required by Fed.R.Civ.P. 26(e) would take place by January 6, 1995 or afterwards as the case may be. With the exception of a minor correction, Vandersluis had not supplemented his report. In February and early March of 1995, Plaintiffs deposed Vandersluis. In his deposition, Vandersluis never expressed the opinion that no hydrologic connection exists.

In response to Plaintiffs' motion for partial summary judgment, Vandersluis opines that "the groundwater in the bedrock is not directly hydrologically connected to surface waters in the vicinity of the overburden pile." Vandersluis Aff. ¶ 12, Defs.' Resp.Pls.' Mot. Part.Summ.J. Counts 1 & 2. Plaintiffs contend that this opinion should be stricken due to Defendants' alleged failure to supplement the Vandersluis expert report. They also assert that this opinion should be stricken because it is ostensibly inconsistent with Vandersluis' previous positions and that of other experts.

Defendants argue that Vandersluis never expressed an opinion concerning the absence of a direct hydrologic connection earlier because he and Defendants were under the impression that Plaintiffs were not contesting the absence of a connection between bedrock groundwater and surface water flows. They argue that Plaintiffs' three expert reports, filed on December 12, 1994, make no assertion of any such connection. In fact, the report of Plaintiffs' expert Francis L. Green, III states, "[A]cid water that is intercepted and moved to the surface and then moved downstream to percolate below the surface *generally has no direct hydrologic connection with the groundwater in the area*, but is just another component of the surface water regime." Green Expert Report at 3, quoted in Vandersluis Aff. ¶ 6 (emphasis added). They also claim that because Plaintiffs never questioned Vandersluis on this topic in his deposition, he never expressed any opinion regarding it. Plaintiffs' partial summary judgment motion represents the first occasion Plaintiffs appeared to assert that a direct hydrologic connection exists.

Fed.R.Civ.P. 26(e)(1) imposes the duty to supplement information contained in expert reports and in depositions. Fed.R.Civ.P. 37(c)(1) provides, "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such error is harmless, be permitted to use as evidence ... on a motion any witness or information not so disclosed."

 Defendants had a "substantial justification" for failing to disclose the Vandersluis opinion concerning the absence of a hydrologic connection until summary judgment. Plaintiffs appeared not to dispute, indeed, appeared to agree with, the proposition that no such connection exists. Moreover, any error is harmless in this instance because, as the next section reveals, sum-

mary judgment for Plaintiffs will be denied for the most part even without the benefit of those paragraphs of the Vandersluis affidavit to which Plaintiffs object. The opinion regarding the absence of a hydrologic connection comes into play only with respect to Plaintiffs' assertion that the groundwater underneath the overburden pile is covered by the CWA. Even if Plaintiffs were to prevail on that issue, summary judgment on count 2 will nevertheless be denied because Plaintiffs have failed to establish that Defendants are in continuing violation of the Acts or that the Dolores Arroyo is a regulated water within the purview of the CWA. To the extent the Vandersluis opinion conflicts with earlier statements or reports, any contradiction affects the opinion's weight, and not its admissibility.

## IX. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS 1 AND 2 AGAINST DEFENDANTS LAC AND PEGASUS

Plaintiffs seek summary judgment on the issue of Defendants' liability for their alleged unpermitted discharges of AMD from the overburden pile, from the remediation and collection system, and from various seeps and springs at the mine site, in violation of 33 U.S.C. § 1342. They also seek summary judgment on count 1; particularly, on the allegation that the overburden pile is an unpermitted discharge of fill material in violation of 33 U.S.C. § 1344. As set forth in section III, *supra,* this portion of Plaintiffs' motion is moot.

The following facts are essentially undisputed. From early 1980 through 1986, Gold Fields dumped nearly 10 million tons of overburden in Dolores Gulch, which includes Dolores Arroyo. The overburden pile constitutes nearly 77 acres.

From July of 1991 to August or September of 1992, Defendants' personnel recorded AMD sightings at various locations below the overburden pile or the catchment pond Defendants constructed to contain AMD. Defendants completed their NMED–supervised remediation system in September of 1992. This system consists of the techniques and constructs discussed in sections V and VI, *supra.*

On February 23, 1993, Mary Barraco, environmental engineer for the joint venture between Defendants LAC and Pegasus, reported to the NMED by letter an acid mine discharge below the toe of the overburden pile. Defendants constructed a small bermed catchment pond to contain this discharge and poured lime into the Arroyo to neutralize these drainages. By letter dated March 9, 1993, Barraco reported to the NMED the results of samples taken of an intermittent spring in Dolores Gulch. The samples indicated an acidity level of 3.25 to 3.5 pH. In a March 5, 1993 memorandum, NMED personnel described a seep containing AMD near the overburden pile and another AMD-contaminated seep in the vicinity of a collection pond. On August 25, 1993 and February 28, 1994, similar seepages were reported. The spring and seepages are waters emanating from the shallow aquifer beneath the overburden pile.

On June 2, 1994, Defendants completed the installation of a grout curtain around and below the interceptor dam in the Arroyo. A grout curtain entails the injection of cement grout into boreholes in the Arroyo. Defendants constructed the curtain to intercept minor quantities of AMD migrating in the shallow rock aquifer. After completion of this grout curtain, specifically, on June 8, 1994, November 15, 1994, February 17, 1995, and March 7, 1995, LAC personnel reported to the NMED surface flows in the Arroyo with varying pH levels.

To establish a violation of the permitting requirements of the CWA, Plaintiffs must prove that Defendants (1) have discharged or are reasonably likely to continue discharging (2) a pollutant (3) into waters of the United States (4) from a point source (5) without a permit. *See Committee to Save Mokelumne River v. East Bay Mun. Util. Dist.,* 13 F.3d 305, 308 (9th Cir.1993) (citing *National Wildlife Fed. v. Gorsuch,* 693 F.2d 156, 165 (D.C.Cir.1982)), *cert. denied,* —— U.S. ——, 115 S.Ct. 198, 130 L.Ed.2d 130 (1994). Defendants admit that they have no permit. In addition, Defendants apparently do not contest Plaintiffs' "pollutant" characterization of AMD and the overburden waste. *See* 33 U.S.C. § 1362(6) (defining pollutant as

"dredged spoil, ... chemical wastes, ... rock, sand, ... and industrial, municipal, and agricultural waste discharged into water."). Defendants also do not appear to dispute that the overburden pile and the remediation system are "point sources" within the meaning of 33 U.S.C. § 1362(14) (defined as "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container ... from which any pollutants are or may be discharged.").

Defendants contest, however, whether they continue to discharge or are reasonably likely to continue discharging any pollutant; dispute the Arroyo's status as a regulated water of the United States; maintain that groundwater is not regulated by the CWA, or if it is, only if the groundwater has a direct hydrologic connection to surface waters, which Defendants deny; and assert that the seepage points in the Arroyo are not point sources.

### A. Continuing Pollutant Discharges

 Because the Supreme Court has construed the Act to preclude citizen suits based on wholly past violations, *Gwaltney*, 484 U.S. at 64, 108 S.Ct. at 385, Plaintiffs must prove, as an element of their case-in-chief, the existence of a continuous or intermittent discharge violation as of the day they filed their complaint. *Carr v. Alta Verde Indus.*, 931 F.2d 1055, 1061 (5th Cir.1991); *Sierra Club v. Union Oil Co.*, 853 F.2d 667, 670 (9th Cir.1988). As a jurisdictional prerequisite, Plaintiffs were only required to "allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney*, 484 U.S. at 57, 108 S.Ct. at 381. However, to maintain their citizen suit for civil penalties, Plaintiffs "must go beyond mere allegations. Plaintiffs must be able to prove that non-compliance was ongoing at the time they filed suit...." *Atlantic States Legal Found. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1134 (11th Cir.1990). And certainly, Plaintiffs must show present non-compliance to be entitled to injunctive relief.

The parties disagree on the significance attributable to the March 9, 1993 spring sample, the seep samples of March 5, 1993, August 25, 1993, and February 24, 1995, and the surface flow samples of late 1994 to March 7, 1995. Plaintiffs characterize these events as either evidence of fresh discharges from the overburden pile or the remediation system or as point source discharges themselves. Defendants maintain that these samples are remnants of residual contamination from AMD flows before the September 1992 completion of the remediation system, and do not represent fresh discharges. (They also contest whether seepages represent point sources within the meaning of the CWA.) Defendants, by way of expert testimony, contend that the remediation system has completely eliminated all new acid mine discharges since September of 1992, with the exception of the February 23, 1993 discharge from the catchment pond—which in any event occurred before Plaintiffs filed their complaint in May of 1994.

Plaintiffs have failed to demonstrate the absence of a genuine issue of material fact as to whether Defendants were in a state of non-compliance at the time Plaintiffs filed their complaint in May 1994. Defendants admit to only one discharge event, the February 23, 1993 catchment pond spill, after completion of the remediation system in September 1992. According to the testimony of two experts Defendants retained, the remediation system has contained all acid mine discharges since February 23, 1993. As for the evidence of the AMD–contaminated spring, surface flows, and seeps arising after September 1992, these same experts conclude that those samples contain residual AMD released into the groundwater prior to completion of the remediation system.

> [T]his diffuse seepage of [AMD]–affected water is the result of residual [AMD] constituents in the alluvium from [AMD] flows which occurred before September, 1992, and ... does not result from any continuing release of [AMD] from the waste rock pile into the Dolores Arroyo drainage. This conclusion is supported by the fact that water quality in the alluvium has steadily improved since the completion of the remediation system in September, 1992.

Schafer Aff. ¶ 6, Defs.' Resp.Pls.' Mot.Part. Summ.J. Counts 1 & 2.

[T]hese areas where [AMD] affected water has occasionally emerged in the Dolores Gulch do not emanate from a discrete joint or fissure but instead emerge and change positions in response to temporary fluctuations in the alluvial water level. The evidence indicates that residual [AMD] constituents do not emanate from a particular "hot spot," but rather are distributed in a plume within the alluvium that has been shrinking over time.

Vandersluis Aff. ¶ 9, Defs.' Resp.Pls.' Mot.Part.Summ.J. Counts 1 & 2. The fact-finder will have to determine what evidentiary weight to give to these opinions. If believed, Plaintiffs cannot prevail on count 2.

▮ To state an actionable claim under section 402, Defendants must have caused the addition of pollutants into regulated waters. Only the unpermitted "discharge of a pollutant" is actionable. 33 U.S.C. §§ 1311(a), 1342(a). "Discharge of a pollutant" is defined as "any *addition* of any pollutant to navigable waters from a point source." *Id.* § 1362(12)(A) (emphasis added). Migration of residual contamination resulting from previous releases is not an ongoing discharge within the meaning of the Act. *See National Wildlife Fed. v. Consumers Power Co.,* 862 F.2d 580, 589 (6th Cir.1988) (hydroelectric dam's facilitation of pollutants already in water not permittable "addition of pollutants" to United States waters); *National Wildlife Fed. v. Gorsuch,* 693 F.2d 156, 175 (D.C.Cir.1982) (upholding EPA's determination that addition of a pollutant occurs only if "the point source itself physically introduces a pollutant from the outside world."). *Compare Committee to Save Mokelumne River,* 13 F.3d at 308 (collected AMD which accidentally spills into river is subject to permitting requirements).

Plaintiffs point to Defendants' June 2, 1994 installation of a grout curtain as evidence of discharges occurring after they filed their complaint in May of 1994. That Defendants took extra precautionary measures to contain possible AMD migration supports, but does not conclusively establish, that fresh acid mine discharges from the overburden pile occurred. According to Plaintiffs' exhibit A offered in support of their motion, the "grout curtain was installed to intercept the minor quantities of [AMD] which were travelling in

the superficial fractured rock zone (i.e., shallow rock aquifer)." Henderson Report, Ex. A Pls.' Mot.Part.Summ.J. Counts 1 & 2. This excerpt does not establish whether the AMD Defendants sought to intercept consisted of fresh discharges or pre-September 1992 discharges.

▮ Finally, Plaintiffs argue that the overburden pile itself is an ongoing discharge of a pollutant into the Arroyo. In other words, every day that Defendants fail to retrieve pollutants they have already discharged is a day Defendants are in violation of the CWA. Plaintiffs' argument renders the Supreme Court's holding in *Gwaltney* meaningless. As with count 1, count 2 is dismissed to the extent Plaintiffs rely on the deposition of the overburden pile as a factual predicate.

## B. The Arroyo as a CWA–Regulated Body of Water

The parties contest whether the Dolores Arroyo is a water of the United States within the purview of the CWA. Defendants' position is that the portion of the Arroyo "from (a) an upland point where diversion channels route surface flows over or around the revegetated overburden pile to (b) the point downgradient from the overburden pile where the diversion channels rejoin the Dolores Arroyo ("the remediation system"), is not a water of the United States." Defs.' Mem.Br.Resp.Pls.' Mot.Part.Summ.J. Counts 1 & 2 at 3. As for the remainder of the Arroyo, Defendants proffer the affidavit of an expert whose testimony is that, essentially, insufficient information exists from which to ascertain whether the Arroyo is a regulated water. Juncosa Aff. ¶ 4 Defs.'Resp.Pls.' Mot.Part.Summ.J. Counts 1 & 2. Plaintiffs assert that Dolores Gulch, which encompasses the Arroyo, is an "ephemeral or intermittent ... tributar[y] of the Galisteo Creek or River. The Galisteo Creek or River is a tributary of the Rio Grande, an interstate water." Pls.' Mem. Br.Supp.Mot.Part.Summ.J. Counts 1 & 2 at 7.

▮ As an initial matter, the Court rejects Defendants' assertion that the portion of the Arroyo covered and diverted by the

overburden pile is no longer a regulated water of the United States. The diversion channels Defendants constructed around the overburden pile are directly connected at both ends of the Arroyo. The overburden changed the course of, but did not eliminate, any existing water flows.

■■■ The Clean Water Act protects navigable waters. 33 U.S.C. §§ 1251, 1342(a). "Navigable waters" are defined as "waters of the United States." *Id.* § 1362(7).[12] The relevant caselaw gleans two principles providing guidance concerning whether the relevant portion of the Dolores Arroyo is a regulated water of the United States. First, the protections of the Clean Water Act reach as far the interstate commerce clause allows. *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 375 (10th Cir.1979) ("It seems clear that Congress intended to regulate discharges made into every creek, stream, river or body of water that in any way may affect interstate commerce."). In *Earth Sciences,* the Tenth Circuit determined that the Rito Seco Creek, located entirely in Costilla County, Colorado, was a regulated water. *Id.* The Tenth Circuit's finding that the entirely intrastate Rito Seco Creek was entitled to CWA protection was based on the parties' stipulation that "the stream supports some trout and some beaver; the water collected in the reservoir is used for agricultural irrigation, and the resulting products are sold in interstate commerce." 599 F.2d at 375. *See also Utah v. Marsh,* 740 F.2d 799, 802–804 (10th Cir.1984) (lake which lies entirely within state of Utah nevertheless regulated by the CWA because of its irrigation utility, its fisheries, its use as a recreational site for out-of-state visitors, and its value as a resting point for migratory waterfowl).

■■■ Second, the fact that the Arroyo is dry most of the year does not preclude its characterization as a regulated water, as long as water flows on some occasions. In *Quivira Mining Co. v. United States Environmental Protection Agency,* 765 F.2d 126, 129 (10th Cir.1985), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986), the Court upheld the EPA's determination that certain arroyos or creek beds carrying water only on an intermittent basis are protected by the Act. "Although neither the Arroyo del Puerto nor the San Mateo Creek is navigable-in-fact, surface flow occasionally occurs, at times of heavy rainfall, providing a surface connection with navigable waters...." *See also United States v. Texas Pipe Line Co.,* 611 F.2d 345, 347 (10th Cir. 1979) ("The intent of the Act was to cover all tributaries to waters like the Red River. It makes no difference that a stream was or was not at the time of the spill discharging water continuously into a river navigable in the traditional sense.").

These principles are encapsulated in the EPA's definition of "waters of the United States":

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce ...

(2) All interstate waters ...

(3) All other waters such as *intrastate* lakes, rivers, streams (*including intermittent streams*), ... the use, degradation, or destruction of which could *affect interstate or foreign commerce* ...

...

(5) *Tributaries of waters* identified in paragraphs (1) through (4) of this section.

40 C.F.R. § 230.3(s) (1994) (emphasis added).

The decisions of *Quivira* and *Earth Sciences* "leave little doubt that the Tenth Circuit has chosen to interpret the terminology of the Clean Water Act broadly...." *Sierra Club v. Colorado Ref. Co.,* 838 F.Supp. 1428, 1434 (D.Colo.1993). However, the *Earth Sciences* and *Marsh* decisions clarify that an entirely intrastate body of water must otherwise affect interstate commerce. The Tenth Circuit found that the Rito Seco Creek did affect interstate commerce because of its support for fish and wildlife and its use for

---

12. As the Supreme Court observed, "[T]he Act's definition of 'navigable waters' as 'waters of the United States' makes it clear that 'navigable' as used in the Act is of limited import." *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 133, 106 S.Ct. 455, 462, 88 L.Ed.2d 419 (1985). Congress intended to regulate waters that might not be strictly navigable, *id.,* although the navigability of a given body of water may influence whether that water implicates interstate commerce.

irrigation purposes. *Earth Sciences,* 599 F.2d at 375. The same cannot be said of the Dolores Arroyo, or at least Plaintiffs have not so indicated.

Given that Plaintiffs have not attempted to show that the Arroyo in itself affects interstate commerce, Plaintiffs must demonstrate that the Arroyo is a tributary of, or at least a conduit of water to, an interstate watercourse, even if only on a sporadic basis. In *Quivira,* the EPA's finding that a usually dry arroyo and creekbed are covered by the CWA, and the Tenth Circuit's affirmation thereof, were based on the fact that heavy rainfall sometimes resulted in surface flows to navigable waters, 765 F.2d at 129, and on the fact that the water from the arroyo also flows through underground aquifers to navigable-in-fact streams. *Id.* In other words, water from an arroyo or creekbed that eventually winds its way to interstate waters or waters affecting interstate commerce is protected by the Act. *See Sun Pipe Line Co. v. Conewago Contractors, Inc.,* No. 4:CV-93-1995, 1994 WL 539326, at *4 (M.D.Pa. Aug. 22, 1994) (*Quivira* stands for the proposition that "non-navigable creeks and 'arroyos' affect interstate commerce because during times of 'intense rainfall' there could be a surface connection between these waterways and navigable streams.").

To be entitled to summary judgment, therefore, Plaintiffs must show, as a matter beyond reasonable dispute, that it is more likely than not that water from that portion of the Dolores Arroyo containing the overburden pile eventually, even if only sporadically, travels to a waterway affecting interstate commerce. If water from the Arroyo eventually drains into the Rio Grande, an undisputed interstate water, the Clean Water Act protects it.

Plaintiffs' proof falls short. Plaintiffs' expert, Thomas Parker, opines that the Arroyo is a tributary of a tributary of the Rio Grande based on his observation of United States Geological Survey ("USGS") topographic maps. Parker Report, Ex. W to Pls.' Mot.Part.Summ.J. Counts 1 & 2 ("Both Dolores and Cunningham Gulches are clearly marked as intermittent streams on published [USGS] maps."). Contrary to Fed.R.Civ.P. 56(e), Plaintiffs fail to submit copies of these maps for the Court's review. *Id.* ("Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith."). And in any event, the fact that the USGS designates the Dolores Gulch as an intermittent stream does not establish that water from that portion of Dolores Arroyo encompassing the overburden actually reaches or has reached the Galisteo Creek and, in turn, the Rio Grande.

Plaintiffs attempt to establish that "surface flows occurred in the Arroyo approximately 17 times from May 26, 1989 to August 1992," Pls.' Mem.Br.Supp.Mot.Part.Summ.J. Counts 1 & 2 at 19, apparently implying that the Arroyo near the overburden pile carried significant quantities of water on at least 17 occasions (but, significantly, without stating that this water flows beyond the Arroyo itself). However, their basis for this statement is test results of a "Soil Conservation Service model" which *predicted* that "storm water runoff through the waste rock pile occurred six times" through May 26, 1989 and December 31, 1990. Stephens Report, Ex. H to Pls.' Mot.Part.Summ.J. Counts 1 & 2. This same report also indicates merely that rainfall records "*suggest* that flow in the Dolores Gulch at the mine site *might* have occurred 11 times between January 1, 1991 and August 1992." *Id.* This evidence is too tentative to establish that water has in fact flowed through the Arroyo from or near the overburden pile in significant quantities.

Other evidence Plaintiffs proffer suggests that flows never even reach Galisteo Creek. The surface flows LAC personnel reported to the NMED on June 8, 1994, November 15, 1994, February 17, 1995, and March 7, 1995, all exhibit a common characteristic: the water stops flowing (by either evaporating or infiltrating into the soil) after a few hundred feet. Exs. S, T, U, & V to Pls.' Mot.Part. Summ.J. Counts 1 & 2.

Plaintiffs rely on the depositions or reports of Defendants' experts, who, Plaintiffs contend, have admitted that the relevant portion of the Arroyo is a regulated water. Exs. A, B, C, & D to Pls.' Reply Supp.Mot.Part. Summ.J. Counts 1 & 2. Dr. Daniel Stephens admitted that water generally flows, in small

quantities, from "Dolores Creek" to Galisteo Creek. *Id.* Stephens Dep.Ex. A at 137. He also stated, however, that he was unsure as to whether any of the water in those flows might have originated from the mine site, *id.* at 138, conceding only that water from the mine site could *possibly* reach the Galisteo Creek "in an extreme event." *Id.* Exhibits B and C, the report and deposition of Dr. Adrian Brown, merely provide that Dr. Brown observed surface flows in the Arroyo which ceased after two or three miles, and say nothing about whether these flows reached Galisteo Creek. *Id.* Brown Report & Dep. Exs. B & C. Exhibit D is the expert report of Dr. William Schafer. Page 11 of Schafer's report seems to begin with the *assumption* that "acidic water was flowing in upper Dolores Gulch." Schafer does not appear to affirmatively assert same in this portion of his report Plaintiffs provide. Plaintiffs highlighted the following excerpt from that page of the report:

> In conclusion, it is not possible with the information available to calculate the number of days that flow in Dolores Gulch would have reached Galisteo Creek. However, for the reasons cited, the number of days that [AMD]-impacted flow reached Galisteo Creek would have been much less than the number of days that upper Dolores Gulch was affected.

*Id.* Schafer Report Ex. D. This passage implies, but does not establish, that AMD-contaminated water from the Dolores Gulch, of which the Arroyo is a part, reaches Galisteo Creek.

The Court is not suggesting that Plaintiffs must provide concrete proof that water from the overburden pile presently flows from the Arroyo to the Rio Grande. They must, however, provide some evidence to suggest that water originating in the Arroyo near the overburden has at least at some time in the past eventually made its way to the Rio Grande, either by way of the Arroyo and Galisteo Creek or through the groundwater,[13] and is reasonably likely to do so again.

Had Plaintiffs made this showing, they would have been entitled to summary judgment on this issue. Defendants, instead of proffering facts in rebuttal, claim, essentially, that insufficient information exists for their expert to form an opinion as to whether the Arroyo is a regulated water.

> To determine whether an ephemeral drainage is a regulated water of the United States involves a highly fact intensive evaluation of the hydrology of the drainage, flow rates, and bank characteristics and vegetation features, etc. I have reviewed the three reports of each of the expert witnesses offered by the plaintiffs ... and in my opinion, these reports do not set forth a sufficient factual basis to establish that the Dolores Arroyo is a water ... regulated by the [Act].

Juncosa Aff. ¶ 4 Defs.' Resp.Pls.' Mot.Part. Summ.J. Counts 1 & 2. Refusal to form an opinion fails to raise genuine issues of material fact. Also, Tenth Circuit precedent demonstrates that the issue of whether a given waterway is protected by the CWA is a straightforward analysis that does not require an evaluation of "hydrology of the drainage," "bank characteristics" or "vegetation features." Flow rates are of course relevant, however.

In summary, Plaintiffs have failed to demonstrate entitlement to summary judgment on the issue of whether that portion of the Dolores Arroyo containing the overburden pile is a regulated water of the United States within the meaning of the CWA. In short, they have failed to make the requisite nexus to interstate commerce. Summary judgment on this issue is therefore denied.

**C. The Regulatory Status of Groundwater**

█ In *Quivira*, the Tenth Circuit supported the EPA's finding of interstate commerce-affected waters in part because "the waters of the Arroyo del Puerto and the San Mateo Creek soak into the earth's surface, become part of the underground aquifers, and after a lengthy period, perhaps centuries, the underground water moves toward eventual discharge at Horace Springs or the Rio San Jose." 765 F.2d at 129. This deci-

---

**13.** To avail themselves of the factual theory of groundwater migration, Plaintiffs would have to show some connection between the groundwater underneath the overburden pile and surface waters affecting interstate commerce, as discussed in section IX.C., *infra.*

sion, and other decisions demonstrating the Tenth Circuit's expansive construction of the Clean Water Act's jurisdictional reach, foreclose any argument that the CWA does not protect groundwater with some connection to surface waters. And although a minority of courts have held otherwise, *see, e.g., Village of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962, 965 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994); *Kelley v. United States,* 618 F.Supp. 1103, 1106–07 (W.D.Mich.1985), most courts to have considered the issue have held that hydrologically connected groundwaters are regulated waters of the United States. *Washington Wilderness Coalition v. Hecla Mining Co.*, 870 F.Supp. 983, 990 (E.D.Wash.1994); *Colorado Ref.*, 838 F.Supp. at 1433–34 (relying *inter alia* on the *Earth Sciences* and *Quivira* decisions); *McClellan Ecological Seepage Situation v. Weinberger*, 707 F.Supp. 1182, 1195–96 (E.D.Cal.1988), *vacated on other grounds,* 47 F.3d 325 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 51, —— L.Ed.2d —— (1995); *New York v. United States,* 620 F.Supp. 374, 381 (E.D.N.Y.1985). *See also* 2 William H. Rodgers, Jr., *Environmental Law: Air & Water* § 4.8 at 114–15 (1986) ("There is little doubt that discharges into groundwaters that eventually move into surface waters are prohibited under Section 301 of the Act."). The Act does not cover isolated, non-tributary groundwater. *Exxon Corp. v. Train,* 554 F.2d 1310, 1311–12 (5th Cir.1977).

Plaintiffs rely completely on Defendants' reports to establish a hydrological connection, arguing that Defendants have conceded its existence. They offer no evidence of their own to bolster their assertion. Although De-

fendants have conceded the existence of a hydrological connection from the alluvium to surface waters, from which the seepages discussed in the next section arise, they maintain that the deeper bedrock groundwater is not hydrologically connected to surface waters in the vicinity of the overburden pile. In fact, Plaintiffs' expert witness, Francis L. Green, seems to concur when he stated, "[A]cid water that is intercepted and moved to the surface and then moved downstream to percolate below the surface *generally has no direct hydrologic connection with the groundwater in the area,* but is just another component of the surface water regime." Green Expert Report at 3, quoted in Vandersluis Aff. ¶ 6 (emphasis added). *See generally* Vandersluis Aff. ¶¶ 6, 7, 12.[14] Because the evidence appears to lead to a conclusion opposite of that which Plaintiffs advance, summary judgment is denied on this issue.

### D. Seepages as Point Sources

■ The Act defines "point source" as:

[A]ny discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14). In contrast, a nonpoint source "should be understood as any source of water pollution or pollutants not associated with a discrete conveyance." Rodgers, *supra* § 4.10 at 146 (citation omitted). The quintessential example of nonpoint source pollution is stormwater runoff

---

14. Neither side has adequately explained the terminology in this context. However, Vandersluis finally provides some enlightenment in his supplement affidavit filed in response to Plaintiffs' motion to strike. According to Vandersluis, not all water that flows underground is technically "groundwater." "Water below table (the saturated zone) is ground water. Water above the water table in the vadose zone (unsaturated zone) is technically not ground water and is referred to by various names; subsurface storm flow ...; interflow ...; and throughflow." Supp. Vandersluis Aff. ¶ 4, Defs.' Resp.Pls.' Mot. Strike Vandersluis Aff. Vandersluis then opines:

The seeps, which are downgradient from the waste rock pile ... are not fed by ground water from the bedrock, but are fed by subsurface storm flow or interflow which occurs in the alluvium above the ground water table. This is approximately what the Plaintiff[s'] expert witness, Francis L. Green, stated when he described the water in the alluvium and/or the alluvium-bedrock interface as part of the surface water regime and not related to ground water.

*Id.* ¶ 5.

from highways, construction sites or industrial parks. *E.g., Earth Sciences,* 599 F.2d at 371 (citing as an example "oil and gas runoffs caused by rainfall on the highways."). Surface mine sites are common non-point source pollution problem areas. *See* 33 U.S.C. § 1314(f)(B) (authorizing the EPA to issue guidelines to address non-point sources of pollutants from, *inter alia,* "mining activities, including runoff and siltation from new, currently operating, and abandoned surface and underground mines.").

The seeps at issue here are apparently nothing more than points at which shallow subsurface water, carrying traces of AMD, emerges through the soil into the Arroyo. Rather than constituting human-originated or -derived point sources of pollutants, these seeps are more accurately described as carriers of water from the alluvium to the surface. Defendants had nothing to do with their creation. Although the overburden pile, as a human-made "discernible, confined, and discrete conveyance," 33 U.S.C. § 1362(14), and the remediation system, as a human-designed circulation and containment system of "sumps, ditches, hoses and pumps," *Earth Sciences,* 599 F.2d at 374, readily constitute point sources, *id.,* the seeps merely represent evidence that AMD has at some time in past entered subsurface waters, possibly from the overburden pile or the remediation system. In other words, the seepages are non-point source carriers of pollutants similar to stormwater, and are therefore not subject to the Act's permitting requirements.

To summarize, the Court grants Plaintiffs' motion for partial summary judgment on the issues of (1) whether AMD constitutes a pollutant, (2) whether the overburden pile and the remediation system are point sources, and (3) whether Defendants possess a discharge permit, as Defendants fail to dispute Plaintiffs' motion on these matters relating to count 2. The Court denies summary judgment as to (1) whether Defendants continue to discharge pollutants, (2) whether the Dolores Arroyo is a regulated water of the United States, (3) whether the deep bedrock groundwater underneath the overburden pile has a hydrologic connection to surface waters, and (4) whether the Arroyo seepages are point sources.

## X. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT 3 AGAINST DEFENDANTS LAC AND PEGASUS

Plaintiffs seek summary judgment on their claim, as alleged in count 3, that Defendants are handling and disposing of hazardous waste without a permit in violation of 42 U.S.C. § 6925. This motion is rendered moot by the Court's disposition of Defendants' motion to dismiss counts 3 and 4, as discussed in section II, *supra.*

The Court will enter an appropriate order.

### *ORDER*

THIS MATTER comes before the Court on Defendant Gold Fields Mining Corp.'s motion to dismiss counts 1–4, filed August 15, 1994 (Docket No. 12), Defendants' motion to dismiss counts 3 and 4, filed September 23, 1994 (Docket No. 23), Defendants' motion for partial summary judgment on count 1, filed November 7, 1994 (Docket No. 31), Plaintiffs' motion to strike affirmative defenses, filed November 21, 1994 (Docket No. 37), Defendants' motion for summary judgment on count 2, filed March 7, 1995 (Docket No. 145), Defendants' motion for summary judgment on count 5, filed March 7, 1995 (Docket No. 147), Defendants' (second) motion for partial summary judgment on count 1, filed March 20, 1995 (Docket No. 151), Plaintiffs' motion to strike portions of Defendants' Vandersluis Affidavit, filed May 12, 1995 (Docket No. 176), Plaintiffs' motion for partial summary judgment on counts 1 and 2 against Defendants LAC Minerals, Inc. and Pegasus Gold Corp., filed March 20, 1995 (Docket No. 153), and Plaintiffs' motion for partial summary judgment on count 3 against Defendants LAC Minerals, Inc. and Pegasus Gold Corp., filed March 20, 1995 (Docket No. 154).

A memorandum opinion was entered on this date. For the reasons set forth therein, the Court finds that Defendant Gold Fields Mining Corp.'s motion to dismiss counts 1–4 is well taken and is granted; that Defendants' motion to dismiss counts 3 and 4 is granted; that Defendants' (first) motion for partial summary judgment is granted; that Plaintiffs' motion to strike Defendants' affirmative defenses is not well taken and is

denied; that Defendants' motion for summary judgment on count 2 is denied; that Defendants' motion for summary judgment on count 5 is granted; that Defendants' (second) motion for partial summary judgment on count 1 is moot; that Plaintiffs' motion to strike portions of the Vandersluis affidavit is denied; that Plaintiffs' motion for partial summary judgment on counts 1 and 2 is granted in part and denied in part; and that Plaintiffs' motion for partial summary judgment on count 3 is moot.

**IT IS, THEREFORE, ORDERED that:**

1. Defendant Gold Fields Mining Corp.'s motion to dismiss counts 1–4 (Docket No. 12) is granted.

2. Defendants' motion to dismiss counts 3 and 4 (Docket No. 23) is granted.

3. Defendants' (first) motion for partial summary judgment (Docket No. 31) is granted; the factual predicate of count 1 concerning Defendants' original placement of the overburden pile is dismissed.

4. Plaintiffs' motion to strike Defendants' affirmative defenses (Docket No. 37) is denied.

5. Defendants' motion for summary judgment on count 2 (Docket No. 145) is denied.

6. Defendants' motion for summary judgment on count 5 (Docket No. 147) is granted; count 5 is dismissed without prejudice. Gold Fields Mining Corp. is dismissed as a Defendant in this action.

7. Defendants' (second) motion for partial summary judgment on count 1 (Docket No. 151) is moot.

8. Plaintiffs' motion to strike portions of the Vandersluis affidavit (Docket No. 176) is denied.

9. Plaintiffs' motion for partial summary judgment on counts 1 and 2 (Docket No. 153) is granted in part and denied in part; summary judgment is granted on the issues of (1) whether AMD constitutes a pollutant, (2) whether the overburden pile and the remediation system are point sources, and (3) whether Defendants possess a discharge permit. The Court denies summary judgment as to (1) whether Defendants continue to discharge pollutants, (2) whether the Dolores Arroyo is a regulated water of the United States, (3) whether the deep bedrock groundwater underneath the overburden pile has a hydrologic connection to surface waters, and (4) whether the Arroyo seepages are point sources.

10. Plaintiffs' motion for partial summary judgment on count 3 (Docket No. 154) is moot.