Coho **SALMON (Onchorynchus kisutch), Environmental Protection Information Center, Inc., Sierra Club, Inc., North-coast Environmental Center, Inc., Plaintiffs,**

v.

**PACIFIC LUMBER COMPANY, a Delaware corporation, Scotia Pacific Holding Company, a Delaware corporation, Salmon Creek Corporation, a Delaware corporation, Defendants.**

No. C–98–0283 MHP.

United States District Court, N.D. California.

Dec. 9, 1998.

Edgar B. Washburn, Washburn Briscoe & McCarthy, SanFrancisco, CA.

Frank Shaw Bacik, Rawles Hinkle Carter Benke & Oglesby, Ukiah, CA.

Susan R. O'Neill, Macon Cowles & Associates, P.C., Boulder, CO.

Jack R. Tuholske, Missoula, MT.

William A. Rossbach, Rosbach & Whiston, Missoula, MT.

Brendan Cummings, Berkeley, CA.

Mark Harris, Arcata, CA.

*OPINION*

PATEL, Chief Judge.

The Environmental Protection Information Center, Inc. ("EPIC"), Sierra Club ("Club"), and Northcoast Environmental Center ("Northcoast") (collectively, "organizations") together with the coho salmon, a threatened species under federal law, bring this action against Pacific Lumber Company and its subsidiaries (collectively, "PALCO") to permanently enjoin PALCO from causing a "take" of coho salmon through its timber harvesting operations in various watersheds in Humboldt County, California, in violation of section 9 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1538.

Now before the court is PALCO's motion for summary judgment on whether each of the plaintiffs has standing to bring this action pursuant to the ESA and its motion to dismiss under the doctrine of primary jurisdiction. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

*BACKGROUND* [1]

Plaintiffs are non-profit organizations which serve their members by seeking to protect and conserve the remaining wild coho salmon and their habitat in northern California, including those which "may exist" in the watersheds of Elk River and the Freshwater, Lawrence, Yager, Bear and Jordan creeks. Plaintiffs' members have a variety of interests with respect to the coho salmon. They include (1) both commercial and sport fishermen who have fished for coho salmon in the Pacific Ocean off the shores of Humboldt County and in the streams and rivers at issue in this action, (2) persons who conduct scientific research and educational studies of coho salmon and coho salmon biology and who wish to continue to do so, and (3) individuals who frequently enjoy observing coho salmon in various stages of their life cycle in all the streams and rivers at issue in this action. Jt. Stmt. Undisp. Facts, at ¶¶ P2–P5. Finally, the three plaintiff organizations

---

1. Unless otherwise noted, the facts herein are taken from the parties' "Joint Statement of Undisputed Facts."

regularly engage in legislative, educational, judicial and administrative processes to provide further protection for the coho salmon in northern California.

The coho salmon is one of many anadramous salmonid species which spawn in and otherwise occupy the rivers and streams of the northern California coast. On May 6, 1997, the National Marine Fisheries Service ("NMFS"), on behalf of the Secretary of Commerce, listed as threatened the Southern Oregon/Northern California Coast "Evolutionarily Significant Unit" of coho salmon. *See* 62 Fed.Reg. 24588 (May 6, 1997). The coho salmon population in the southern Oregon/northern California region has declined from an estimated 150,000 to 400,000 naturally spawning fish in the 1940s to less than 10,000 naturally producing adults today. *Id.* at 24588. The dramatic reduction in the coho salmon population has been due to many natural and man-made conditions, including long-term trends in atmospheric conditions, such as El Niño, which cause extremes in annual rainfall on the northern California coast, the predation of coho salmon by California sea lions and Pacific harbor seals, and commercial timber harvesting. *See* Jt. Stmt. Undisp. Facts, at ¶¶ 50–56; *see also* 62 Fed.Reg. at 24588.

This litigation, as many others like it, revolves around PALCO's timber harvesting operations in Humboldt County. PALCO conducts timber harvesting operations in the watersheds of the Elk River and the Bear, Freshwater, Jordan and Yager creeks pursuant to various "timber harvest plans" ("THPs") issued by the California Department of Forestry and Fire Prevention ("CDF"). According to plaintiff, approximately 4000 acres of forest are now logged in these watersheds pursuant to 53 approved THPs, while sixteen THPs consisting of another 2000 acres are pending approval by the CDF. *See* Compl., at ¶¶ 51–52 & Attachment 3. PALCO's commercial logging operations have caused the introduction of sediment and silt into the rivers and creeks at issue in this litigation and are a recognized cause for coho salmon habitat degradation and for the reduction in coho salmon reproduction. Jt. Stmt. Undisp. Facts, at ¶ P16. Plaintiffs now allege that PALCO's past and present harvesting operations, including logging, haul-ing, and the construction and maintenance of roads and bridges, have resulted in significant habitat modification and degradation from erosion which has caused and continues to cause an unlawful "take" of coho salmon in violation of section 9 of the ESA. Compl., at ¶¶ 55–69.

In response, PALCO maintains that modifications to its logging operations pursuant to various agreements with the federal and state governments has reduced the impact of timber harvesting on coho salmon and their habitat. On September 28, 1996, PALCO and its parent company, MAXXAM, Inc., entered into an agreement ("Headwaters Agreement") with the state and federal governments to convey certain tracts of land in Humboldt County to the federal and state governments in order to create a forest preserve commonly referred to as the "Headwaters Forest." The Headwaters Agreement contemplates the sale of approximately 5,600 acres of old growth forest owned by PALCO for the creation of a 7,500 acre forest reserve jointly managed by the federal and state governments. As part of the Headwaters Agreement, PALCO agreed to prepare and seek approval of a "sustained yield plan" under California law and a combination multi-species "habitat conservation plan" under federal law (collectively, "HCP"). Along with providing strategies for protecting coho salmon habitat, the HCP contemplates the issuance of an incidental take permit ("ITP") under the ESA and its state law counterpart, which would allow PALCO to legally "take" various species now listed as endangered or threatened, including the coho salmon, the marbled murrelet and the northern spotted owl, as well as species which may be listed in the future. The purpose of the HCP is therefore two-fold: to provide protection for endangered and threatened species and to provide PALCO with some degree of regulatory certainty in conducting future timber harvesting operations on its lands in northern California.

In October 1996, PALCO and state and federal wildlife agencies began negotiations on the content of the various provisions of the HCP required to be submitted under the Headwaters Agreement. On February 27,

1998, PALCO and the federal and state governments signed a "Pre–Permit Application Agreement in Principle" ("PPAAP") which sets forth the framework for the terms of the HCP, the HCP approval process, as well as for modifications in PALCO's harvesting operations pending approval of the HCP and the issuance of the ITP. On July 12, 1998, PALCO submitted its HCP to both the federal and state agencies for approval and applied for an ITP. Both the approval of the HCP and the issuance of the ITP are now pending.

## LEGAL STANDARDS

### I. Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (the nonmoving party may not rely on the pleadings but must present significant probative evidence supporting the claim).

In response to a summary judgment motion on the issue of standing, the plaintiff cannot rest on "mere allegations," but rather, must set forth by affidavit or other competent evidence "specific facts" which for the purposes of the summary judgment motion will be taken to be true. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1352 n. 11 (9th Cir.1994). In contrast, on a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct may suffice" because general allegations are presumed to "embrace those specific facts that are necessary to support the claim." *Id.*

### II. Endangered Species Act

■ Congress enacted the ESA in 1973 in response to growing public concern about extinctions of various species of fish, wildlife, and plants caused by "economic growth and development untempered by adequate concern and conservation." *Forest Conservation Council v. Rosboro Lumber Co.,* 50 F.3d 781, 783 (9th Cir.1995); 16 U.S.C. § 1531(a). Section 9 of the ESA makes it unlawful for any person to "take" any threatened or endangered species of fish or wildlife within the United States, unless an ITP or other exemption is obtained pursuant to section 10 of the ESA, 16 U.S.C. § 1539. 16 U.S.C. § 1538. "Take" is defined to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. 1532(19). "Harass" in the definition of "take" in the ESA means:

> an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering.

50 C.F.R. § 17.3. Similarly, the Secretary of the Interior defines "harm" in the definition of "take" in the ESA to mean:

> an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

*Id.* A showing of "an imminent threat of future harm is sufficient for the issuance of an injunction under the ESA." *Marbled Murrelet v. Babbitt,* 83 F.3d 1060, 1066 (9th Cir. 1996), *cert. denied sub nom., Pacific Lumber Co. v. Marbled Murrelet,* 519 U.S. 1108, 117 S.Ct. 942, 136 L.Ed.2d 831 (1997) (citations omitted). Moreover, in order to establish "harm" from habitat modification, plaintiff must show "significant impairment of the species' breeding or feeding habits and prove that the habitat degradation *prevents, or possibly, retards, recovery of species." National Wildlife Federation v. Burlington Northern Railroad, Inc.,* 23 F.3d 1508, 1512–13 (9th Cir.1994) (emphasis added); *see Rosboro,* 50 F.3d at 788 n. 4.

■ "The ESA's citizen suit provision, 16 U.S.C. § 1540(g), allows private plaintiffs, like Sierra Club, to enjoin private activities that are reasonably certain to harm a protected species." *Sierra Club v. Babbitt,* 65 F.3d 1502, 1512 (9th Cir.1995) (citing *Rosboro,* 50 F.3d at 784, 787–88). *See also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 696–700, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (upholding regulations that prohibit a private entity from modifying habitat where it could lead to a "take" of a protected species); *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 1163, 1166, 137 L.Ed.2d 281 (1997) ("any person" may bring action under section 1540(g) against "private violators of environmental restrictions"). Section 1540(g)(1) states that "any person may commence a civil action on his own behalf" to enforce the provisions of the ESA. 16 U.S.C. § 1540(g). The term "person" refers to, among other things, "an individual, corporation, partnership, trust association, or any other private entity." 16 U.S.C. § 1532(13). Environmental organizations therefore qualify as a "person" and may bring suits under the ESA in their own name.

## III. *Standing*

An Article III court cannot entertain the claims of a litigant unless that party has demonstrated the threshold jurisdictional issue of whether it has constitutional and prudential standing to sue. *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130; *see Salmon River,* 32 F.3d at 1353. Article III, section 2 of the United States Constitution extends the judicial power of the federal courts only to cases or controversies. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998). The party invoking federal jurisdiction bears the burden of establishing three requirements in order to meet the "irreducible constitutional minimum of standing." *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130. "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* (internal quotations and citations omitted). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of some third party not before the court. *Id.* 504 U.S. at 560–61, 112 S.Ct. 2130. Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." *Id.* (internal quotations and citations omitted).

In addition, where Congress is the source of the alleged legal violation, the Supreme Court has recognized a prudential component to standing requiring that the plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision invoked. *Bennett,* 520 U.S. 154, 117 S.Ct. at 1161. However, because the ESA civil suit provision broadly permits "any person" to institute an action to enforce the ESA's provisions, the *Bennett* Court held that section 1540(g) applies to actions against private violators of the ESA's restrictions, as well as to actions against the Secretary of Interior asserting both the over enforcement and under enforcement under of the ESA's provisions. *Id.* 520 U.S. 154, 117 S.Ct. at 1163 ("no textual basis" for saying that ESA citizen-suit provision "applies to environmentalists alone"). In doing so, the Court held that the "any person" formulation of section 1540(g) acted to "negate" the zone of interests test as applied to the ESA. *Id.* 520 U.S. 154, 117 S.Ct. at 1162–63. *Compare Bennett,* 520 U.S. 154, 117 S.Ct. at 1167–68 (plaintiff must establish that injury falls within zone of interests protected by ESA ("species preservation") in review of agency decision under section 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702). The Court noted that its "readiness to take the term 'any person' at face value" for the purposes of negating the zone-of-interests test under the ESA was in part because "the overall subject matter of this legislation is the environment (a matter in which it is common to think all persons have an interest) and that the obvious purpose of [section 1540(g) ] is to encourage enforcement by so-called 'private attorneys general.'" *Id.* 520 U.S. 154, 117 S.Ct. at 1162. In doing so, the *Bennett* court concluded that the petitioner ranch operators and irrigation districts, who had competing

economic and other interests in a water project affected by a biological opinion issued by the U.S. Fish and Wildlife Service ("FWS") and favorable to endangered species, had standing under the zone-of-interests test to challenge the biological opinion under the ESA. *Id.* 520 U.S. 154, 117 S.Ct. at 1163.

 Finally, an environmental organization such as EPIC or the Sierra Club may have standing to sue "in its own right . . . to vindicate whatever rights and immunities the association itself may enjoy," and in doing so, "may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties." *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Moreover, even if the organization has not suffered injury to itself, it may have standing to assert the rights of its members if (1) its members would have standing to sue on their own; (2) the interests it seeks to protect are germane to its purpose, and (3) its claim and requested relief do not require participation by individual members. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). *See also Warth,* 422 U.S. at 511, 95 S.Ct. 2197 ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members"); *Salmon River,* 32 F.3d at 1352 n. 10; *Sierra Club v. Morton,* 405 U.S. 727, 734–41, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (association

must allege that its members are suffering immediate or threatened injury of the sort that would be a justiciable case had members brought suit individually). "The possibility of such representational standing, however, does not eliminate or attenuate the constitutional requirement of a case or controversy." *Warth,* 422 U.S. at 511, 95 S.Ct. 2197.

## DISCUSSION

PALCO initially maintains that neither the environmental organizations nor the coho salmon have standing to bring this action. PALCO contends both that EPIC and the other environmental organizations have neither "organizational" nor "representational" standing to bring this action and that the ESA does not permit "animal species" such as the coho salmon to bring suit under section 1540(g). PALCO concludes by arguing that under the doctrine of primary jurisdiction the court should defer to administrative proceedings currently pending before the NMFS and FWS to approve the HCP submitted by PALCO.

Because EPIC and the other environmental groups have pointed to sufficient facts to survive summary judgment on the issue of standing, the court declines PALCO's invitation to determine whether the coho salmon has standing to sue on its own behalf under the ESA.[2] Moreover, the court need not reach the issue of whether the organizations

---

**2.** The court's decision not to address this issue is not for want of case law addressing the question of whether the ESA authorizes species to sue on their own behalf. Some courts have permitted suits to go forward under the citizen suit provisions of the ESA with fish and wildlife species as the named plaintiffs even though the definition of "person" under section 1532(13) does not include fish or wildlife species. *Cf. Marbled Murrelet v. Pacific Lumber Co.,* 880 F.Supp. 1343, 1346 (N.D.Cal.1995), *aff'd,* 83 F.3d 1060 (9th Cir. 1996), *cert. denied sub nom., Pacific Lumber Co. v. Marbled Murrelet,* —— U.S. ——, 117 S.Ct. 942, 136 L.Ed.2d 831 (1997) (species protected under ESA has standing to sue "in its own right" to enforce the provisions of the ESA); *Palila v. Hawaii Dep't of Land and Natural Resources,* 852 F.2d 1106, 1107 (9th Cir.1988) ("the bird (*Loxioides bailleui*), a member of the Hawaiian honeycreeper family, also has legal status and wings its way into federal court as a plaintiff in its own right"); *Loggerhead Turtle v. County Council of Volusia County, Florida,* 896 F.Supp.

1170, 1177 (M.D.Fla.1995), *rev'd on other grounds,* 148 F.3d 1231 (11th Cir.1998). *Compare Hawaiian Crow ('Alala) v. Lujan,* 906 F.Supp. 549, 552 (D.Hawaii 1991) (listed bird not a "person" within meaning of ESA's citizen-suit provisions). As noted, fish and wildlife species are clearly not defined to be a "person" under section 1532(13) that can bring an action under section 1540(g). Moreover, the ESA defines "fish or wildlife" separately from that of the term "person." *See* 16 U.S.C. § 1532(8).

Plaintiffs contend that fish and wildlife species fall within section 1540(g) because the definition of the term "person" includes the clause "any other entity within the jurisdiction of the United States." 16 U.S.C. § 1532(15). Plaintiffs conclude that "any other entity" should be interpreted to include the coho salmon. Without delving into the vagaries of the term "entity," the court notes that, to swim its way into federal court in this action, the coho salmon would have to battle a strong current and leap barriers greater than a waterfall or the occasional fallen tree.

have standing to sue on their own behalf—i.e., "organizational" standing—because the organizations do not assert in their opposition to PALCO's motion for summary judgment that they have organizational standing.[3]

## I. *Associational standing*

 PALCO maintains that the organizations do not have standing to bring a section 9 taking claim on behalf of their members. Initially, it argues that the citizen suit provision of the ESA precludes "representative" suits brought by environmental organizations such as EPIC and the Sierra Club on behalf of their members who have suffered a cognizable injury. Based on a footnote in the *Steel Co.* opinion, PALCO asserts that, because section 1540(g) permits a "person" to sue only "on his own behalf," an association may bring a suit under the ESA only for injuries that the association has suffered, rather than as a representative of its members. In *Steel Co.*, the Supreme Court addressed the question of whether an environmental group had standing to bring an action under the Emergency Community Planning and Right–to–Know Act of 1986 ("ECPRA"), 42 U.S.C. § 11046(a), (c), against a steel company for failure to file timely hazardous chemical storage and emission reports. *Steel Co.*, 523 U.S. 83, 118 S.Ct. at 1008. In addressing the defendant steel company's arguments on standing, the Supreme Court noted *in dictum* that "it is arguable" that the citizen-suit provision of the ECPRA, 42 U.S.C. § 11046(a)(1), which allows "any person" to "commence a civil action on his own behalf" and which defines "person" to include associations, 42 U.S.C. § 11049(7), "permits respondent to vindicate only its own interests as an organization, and not the interests of its individual members." *Steel Co.*, 523 U.S.

83, 118 S.Ct. at 1018 n. 6. The Court, however, did not resolve its query; rather, because the resolution of the question it posed made no difference to its disposition of the case, it assumed that the environmental organization could sue on the basis of the interests of its individual members. *Id.*

PALCO's reliance on the ruminations of the *Steel Co.* court ignores prior Supreme Court case law regarding the nature of associational standing. The Supreme Court has noted that the first requirement of the associational standing test, that at least one of the organization's members would have standing to sue on his own, "is grounded on Article III as an element of 'the constitutional requirement of a case or controversy.' " *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996) (quoting *Warth*, 422 U.S. at 511, 95 S.Ct. 2197); *Automobile Workers v. Brock*, 477 U.S. 274, 281–82, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) ("injury to an organization's member will satisfy Article III") (citations omitted). The second and third prongs in many respects appear to be at least quasi-prudential in nature. *See, e.g.*, Robert B. June, The Structure of Standing Requirements for Citizen Suits and the Scope of Congressional Power, 24 Envtl. L. 761, 788 (1994); *United Food*, 517 U.S. at 555, 116 S.Ct. 1529 ("associational standing test's third prong is a prudential one").

The second prong of the associational standing test "complements" the first, in that "its demand that an association plaintiff be organized for a purpose germane to the subject of its member's claim raises an assurance that the association's litigators will themselves have a stake in the resolution of

---

**3.** In order to establish organizational standing, the organizations would have to "meet the same standing test that applies to individuals by showing actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C.Cir.1990) (internal quotations and citations omitted). "In those cases where an organization is suing on its own behalf, it must establish concrete and demonstrable injury to the organization's activities—with a consequent drain on the organization's resources—constituting more than simply a setback to the organiza-

tion's abstract social interests. Indeed, the organization must allege that discrete programmatic concerns are being directly and adversely affected by the challenged action." *Common Cause v. Federal Election Comm'n*, 108 F.3d 413, 417 (D.C.Cir.1997) (quoting *National Taxpayers Union, Inc. v. U.S.*, 68 F.3d 1428, 1433 (D.C.Cir. 1995)) (internal quotations omitted). *See also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). Plaintiffs do not make any showing that PALCO's harvesting operations are directly and adversely affecting their "discrete programmatic concerns."

the dispute, and thus be in a position to serve as the defendant's natural adversary." *United Food,* 517 U.S. at 555, 116 S.Ct. 1529. This is a key aspect of the purpose behind associational standing, as the Supreme Court has stated:

> [T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others. "The only practical judicial policy when people pool their capital, their interests, or their activities under a name and form that will identify collective interests, often is to permit the association or corporation in a single case to vindicate the interests of all." *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 187, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Jackson, J., concurring); *see NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (association "is but the medium through which its individual members seek to make more effective the expression of their views"). The very forces that cause individuals to band together in an association will thus provide some guarantee that the association will work to promote their interests.

*Automobile Workers,* 477 U.S. at 290, 106 S.Ct. 2523. The *Automobile Workers* court further explained the "association's role in pending litigation: '[T]he interest and expertise of this plaintiff, when exerted on behalf of its directly affected members, assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult ... questions.'"[4] *Id.* (quoting *Harlem Valley Transportation Association v. Stafford,* 360 F.Supp. 1057, 1065 (S.D.N.Y.1973), *aff'd,* 500 F.2d 328 (2d Cir.1974)). *See also United Food,* 517 U.S. at 557, 116 S.Ct. 1529 (associ-

ational standing "rests on the premise that ... particular relationships ... are sufficient to rebut the background presumption (in the statutory context, about Congress's intent) that litigants may not assert the rights of absent third parties").

Because the principles underlying associational standing assure that the association has a stake in the resolution of the dispute and serves as the defendant's natural adversary, the association, in representing the interests of its members, stands in its members' stead rather than asserting the generalized interests of a third pary unconnected to the association. As such, the phrase "on his behalf" in section 1540(g) does not limit the ability of an environmental organization to represent the interests of its members. Moreover, as noted by the Supreme Court in *Bennett,* the prudential requirement for standing is broadened for suits brought under the citizen suit provision of the ESA because "the overall subject matter of [the ESA] is the environment (a matter in which it is common to think all persons have an interest) and that the obvious purpose of the [citizen suit] provision in question is to encourage enforcement by so-called 'private attorneys general.'" *Bennett,* 520 U.S. 154, 117 S.Ct. at 1162. In keeping with this concern, numerous courts have permitted environmental groups to sue under the citizen suit provisions of the ESA and identical provisions contained in other environmental statutes. *Cf. Sierra Club v. Aluminum Co. of America,* 585 F.Supp. 842, 847–48 (N.D.N.Y.1984) ("on his own behalf" phrase in citizen suit provision of Federal Water Pollution Control Act Amendments of 1972 ("CWA"), 33 U.S.C. § 1365(b), does not preclude associational standing); *Friends of the Earth, Inc. v. Crown Central Petroleum Corp.,* 95 F.3d 358, 359 (5th Cir.1996) (con-

---

4. The Supreme Court's approach towards associational standing echoes the impression of the early and astute observer of American society, Alexis de Tocqueville, of the role of the association in the United States. "An association unites into one channel the efforts of divergent minds and urges them vigorously towards the one end which it clearly points out." Alexis de Tocqueville, 1 DEMOCRACY IN AMERICA, 199 (Bradley, P. ed.) (1945). "The most natural privilege of man, next to the right of acting for himself, is that of

combining his exertions with those of his fellow creatures and of acting in common with them." *Id.* at 203. In referring to the governing of organizations, de Tocqueville further states that "[t]he independence of each individual is recognized: as in society, all the members advance at the same time towards the same end, but they are not all obliged to follow the same track. No one abjures the exercise of his reason and free will, but everyone exerts that reason and will to promote a common undertaking." *Id.* at 205.

sidering associational standing under citizen-suit provision of CWA); *Rosboro,* 50 F.3d at 783.

■ Nonetheless, in order to proceed with the instant action, the organizations must establish associational standing by showing that (1) their members' would have standing to sue on their own; (2) the interests they seek to protect are germane to their purpose, and (3) their claim and requested relief do not require participation by individual members. *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434; *Salmon River,* 32 F.3d at 1352 n. 10. It is without dispute that EPIC and the other environmental organizations serve their members by seeking to protect and conserve the remaining wild coho salmon and their habitat in northern California. *See* Jt. Stmt. Undisp. Facts, at ¶¶ P8, P10 & P14. Thus, the interests that the organizations seek to protect—the preservation of coho salmon—are clearly germane to the purpose of the organizations. Moreover, the injunctive relief sought by EPIC and the other organizations does not require the participation of any of the organizations' individual members. The only remaining question which the court must address is whether the members of the organizations would have standing to sue on their own behalf.

## A. *Injury in fact*

■ In order to meet the injury in fact requirement, plaintiffs must submit affidavits or other evidence showing, through specific facts, that one or more of their members would be "directly affected apart from their special interest in the subject." *Defenders of Wildlife,* 504 U.S. at 563, 112 S.Ct. 2130. The Supreme Court has made clear that although "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing," the "injury in fact" test "requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Id.* 504 U.S. at 562–63, 112 S.Ct. 2130. Thus, the "key requirement" for the

purposes of standing is "that the plaintiff have suffered his injury in a personal and individual way." *Animal Legal Defense Fund, Inc. v. Glickman ("ALDF"),* 154 F.3d 426, 433 (D.C.Cir.1998). At a minimum, the facts must show that one of plaintiff's members is susceptible to "actual or imminent" injury. *Defenders of Wildlife,* 504 U.S. at 564, 112 S.Ct. 2130.

Plaintiffs provide the declarations and deposition testimony of Paul Mason, Kathy Bailey, Tom Weseloh, Chuck Powell and Tim McKay, each of whom are members of each of the plaintiff organizations, in order to establish that its members have suffered an injury in fact.[5] Plaintiffs' members indicate that they have a close connection to and derive substantial aesthetic and recreational enjoyment from the watersheds at issue. Ms. Bailey, a member of the Sierra Club, since 1992, states that the Club's members "frequently hike, backpack, kayak, or otherwise spend time within the vicinity of the watersheds in question in this litigation for the purpose of observing and enjoying coho salmon in the wild" and that some of the Club's members "live within close proximity to these watersheds." Bailey Decl., at ¶ 5. Mr. Mason, a member of EPIC, states that his residence in Redway, California, is a short distance from Eel River and that he "regularly visit[s] watersheds in Humboldt County to attempt to observe coho salmon, including the legally accessible portions of the watersheds at issue in this suit." Mason Decl., at ¶ 1. He also states that EPIC's members derive recreational, aesthetic and educational benefit from the continued existence of coho salmon, and that some of its members have furthered these interests by gathering data concerning the habitat conditions of the streams at issue in this action. *Id.,* at ¶ 4. Mr. McKay, a staff director of Northcoast, states that Northcoast's members include commercial and recreational fishermen who are no longer able to fish for coho salmon because of the listing of the coho salmon as a threatened species. McKay

---

**5.** PALCO raise a number of objections to statements contained in the numerous affidavits, declarations, and depositions submitted by plaintiffs. For example, PALCO contends that the statements of Bailey and Mason should be excluded

under Fed.R.Evid. 602 because they are not based on personal knowledge. However, these statements are admissible to the extent that the statements were based on the personal knowledge of the affiant.

Decl., at ¶ 27. Finally, both Mr. Weseloh and Mr. Powell state that they have either fished in the watersheds at issue in this action or that coho salmon are part of the aesthetic enjoyment they derive from the use of the watersheds at issue. Harris Decl., Ex. D–3 (Powell Dep.), at 113 & Ex. C (Weseloh Dep.), at 64–66.

■ Moreover, each of plaintiff's members frequently enjoy observing coho salmon in various stages of their life cycle in all the streams and rivers at issue here. Jt. Stmt. Undisp. Facts, at ¶ P4. For example, Mr. Weseloh states that he has stocked some of the watersheds at issue with coho salmon and has observed and fished for coho salmon in the watersheds involved here. Harris Decl., Ex. D–2 (Weseloh Dep.) at 10, 64, 66, 89 (indicating with specificity where and when he has observed and fished for coho salmon in the watersheds at issue). Plaintiffs have thus pointed to sufficient facts to create a disputed issue whether their members have suffered injury in a personal and individual manner from the depletion of coho salmon and the degradation of coho salmon habitat in the watersheds at issue. *See Salmon River,* 32 F.3d at 1352.

■ PALCO nonetheless argues that because plaintiffs' members have no access to PALCO's private lands their injury is merely a generalized injury relating to the overall coho salmon population which is insufficient to confer standing upon plaintiffs' members. Although plaintiffs' members cannot trespass upon PALCO's lands to observe coho salmon, they enjoy observing and using coho salmon in the streams and rivers which flow through or are adjacent to boundaries of PALCO's lands. Jt. Stmt. Undisp. Facts, at ¶ P4; *see also* Harris Decl., Ex. D–2 (Weseloh Dep.) at 10, 64, 66, 89 (indicating with specificity where and when he has observed and fished for coho salmon in the watersheds at issue). Section 1540(g) clearly permits private plaintiffs to enjoin private activities, such as PALCO's logging operations, that are reasonably certain to harm a protected species. *See Sierra Club,* 65 F.3d at 1512.

■ PALCO further contends based on *Sweet Home* and regulations promulgated under the ESA that plaintiffs have also failed to provide any showing that its activi-ties "actually kills or injures wildlife." *See Sweet Home,* 515 U.S. at 691 n. 2, 115 S.Ct. 2407 (citing 40 Fed.Reg. 44412, 44416 (1975) & 46 Fed.Reg. 54748, 54750 (1981)). The Ninth Circuit, however, has rejected PALCO's argument that a plaintiff must show actual death or injury to a protected species in order to obtain injunctive relief under the ESA. *Marbled Murrelet,* 83 F.3d at 1065–66 (rejecting footnote 2 of *Sweet Home* as dictum and holding that "harm" regulation prevents "a finding of harm from habitat modification alone," without actual harm to a protected species); *Rosboro,* 50 F.3d at 787–88. Rather, the Ninth Circuit has held that section 9 provides the appropriate safeguard "when a wholly private action threatens *imminent harm* to a listed species." *Sierra Club,* 65 F.3d at 1512 (emphasis added). Similarly, "[h]abitat modifications that significantly impair a protected species' essential behavioral patterns are explicitly proscribed" by the regulations promulgated under the ESA. *Rosboro,* 50 F.3d at 788. To the extent that it is undisputed that PALCO is conducting timber operations and that sedimentation from these operations results in the degradation of coho salmon habitat and concomitant harm to coho salmon, plaintiffs have created a disputed issue of fact, for the purposes of standing, as to whether the habitat modifications complained of have harmed or threaten imminent future harm to coho salmon.

■ In a related argument, PALCO contends on the merits that plaintiffs have failed to establish that its timber harvesting operations actually "take" coho salmon. "Whether a plaintiff has a legally protected interest (and thus standing) does not depend on whether he can demonstrate that he will succeed on the merits." *ALDF,* 154 F.3d at 441 (quoting *Claybrook v. Slater,* 111 F.3d 904, 907 (D.C.Cir.1997)). PALCO overreaches in arguing that plaintiffs, at this stage of the litigation, must conclusively establish that PALCO's logging operations are reasonably certain to cause imminent future harm to the coho salmon population in the watersheds at issue. *See Sierra Club,* 65 F.3d at 1512. Clearly, if PALCO's logging operations result in a "take" of coho salmon, then the organizations' members' aesthetic and scien-

tific interests in coho salmon would obviously be concretely affected. *Cf. Defenders of Wildlife*, 504 U.S. at 566, 112 S.Ct. 2130 ("[i]t is clear that the person who observes or works with a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist"); *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1581 (9th Cir.1993) (environmental organizations held to have standing to pursue section 9 action).

### B. *Causation and redressability*

PALCO argues that plaintiffs have also failed to establish that their members' injuries were caused by PALCO's logging practices in the watersheds at issue and are not redressable by the remedies sought by plaintiffs. In doing so, PALCO first contends that the reduction of coho salmon is attributable to a variety of factors other than PALCO's logging operations, including intervening and superseding ecological and man-made occurrences. PALCO further asserts that an order enjoining PALCO from conducting any "logging, yarding or removal activities or new road construction" in the watersheds at issue and requiring PALCO to restore the watersheds to mitigate ongoing and future harm is not certain to "result in the increased coho salmon population" that would be needed to redress the alleged injuries suffered by plaintiffs' members. *See* Compl., at ¶¶ 75–76.

 Courts often consider the causation and redressability prongs in juxtaposition when both focus on similar questions of causation. *See Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1517 (9th Cir. 1992). "The fairly traceable element explores the causal connection between the challenged conduct and the alleged harm." *Loggerhead Turtle v. County Council of Volusia County, Florida*, 148 F.3d 1231, 1247 (11th Cir.1998). The causal link between the alleged harm and the challenged conduct may become too attenuated "if the injury complained of is 'the result of the independent action of some third party not before the court.'" *Bennett*, 520 U.S. 154, 117 S.Ct. at 1164 (quoting *Defenders of Wildlife*, 504 U.S. at 560–61, 112 S.Ct. 2130) (internal quotations and citations omitted). Similarly, the "redressability" prong of the standing doc-

trine asks whether it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. 2130 (internal quotation marks and citations omitted).

In making its arguments with respect to causation and redressability, PALCO invokes case law involving alleged "procedural injuries" resulting from a federal agency's failure to comply with a statutory or regulatory procedure such as the ESA consultation requirements. *See Defenders of Wildlife*, 504 U.S. at 573 n. 7, 112 S.Ct. 2130; *Idaho Conservation League*, 956 F.2d at 1517. In these cases, the causation prong requires some "causal nexus" between agency action (or inaction) and the injury asserted by the plaintiff. *Humane Society of the United States v. Babbitt*, 46 F.3d 93, 100 (D.C.Cir. 1995). In *Pacific Northwest Generating Cooperative v. Brown*, 822 F.Supp. 1479, 1502–03 (D.Or.1993), *aff'd*, 38 F.3d 1058 (9th Cir. 1994), the court held that the plaintiffs, who represented high volume user interests in hydropower operations and who claimed injuries resulting from the loss of hydropower use and utility rate increases due to government-ordered water flow reductions and other mitigation efforts directed towards listed species, did not have standing to raise their claim that the Secretary of Commerce violated the ESA's section 7 consultation requirements. *See id.* 822 F.Supp. at 1483–94. In so holding, the court noted first that even if the federal defendants complied with the ESA's consultation requirement, an attenuated chain of causation, which included the independent actions of numerous third parties, linked the plaintiffs' claimed injury with the inaction of the federal defendants. *Id.* 822 F.Supp. at 1502. Furthermore, the court found that because the loss of water for hydropower use and rate increases were only partially attributable to mitigation efforts directed to the listed species, but were also attributable to other factors such as drought conditions and dramatic population increases, "whether or not plaintiffs' claimed injuries from rate increases and power instability could be cured by the relief sought renders the 'redressability' element of standing a weak one, at best." *Id.* 822 F.Supp. at 1502.

Similarly, in *Defenders of Wildlife*, involving a challenge to the failure of the United States Agency for International Development ("AID") to consult with the Secretary of the Interior as required by the consultation provisions of the ESA, 16 U.S.C. § 1536(a)(2), the Court held that the plaintiff failed to demonstrate redressability because it was "entirely conjectural whether the non-agency activity that affects respondents will be altered or affected by the agency activity they seek to achieve." *Id.* 504 U.S. at 571, 112 S.Ct. 2130. In doing so, the Court noted that procedural rights are special:

> [O]ne living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered.

*Id.* "Procedural injury" cases, however, are not appropriate for determining either causation or redressability in the instant action. "When a claimant's challenge against agency action or inaction is premised upon the unlawful regulation or lack of regulation of someone else, standing is 'substantially more difficult to establish'" because the claimant must come forward with evidence that "the third parties will act in such a manner as to cause it a redressable injury." *Pacific Northwest*, 822 F.Supp. at 1501 (quoting *Defenders of Wildlife*, 504 U.S. at 562–63, 112 S.Ct. 2130).

■■■ Unlike the many procedural injury cases addressed by the courts, the "harm" alleged by plaintiffs—injury to their members' aesthetic and scientific interests as a result of the "take" of coho salmon—does not involve the independent actions of third persons. The harm suffered by plaintiffs' members is tied directly to PALCO's logging activities and cessation of those activities will end the "take" of coho salmon.[6] *See* Bailey Decl., at ¶ 11. In so holding, the court notes that PALCO frames the scope of the relief sought by plaintiffs too broadly. While it is

without question that plaintiffs would like to see increased coho salmon populations in the watersheds at issue, at root, the organizations seek only to enhance their aesthetic enjoyment and use of coho salmon by halting the illegal "takes" caused by PALCO's logging activities. In contrast, both *Pacific Northwest* and *Defenders of Wildlife* involved a lengthy chain of causation in which several intervening factors contributed to the alleged harm. The court notes, however, that the determination that plaintiffs have standing to proceed in this action is only the first hurdle. Plaintiffs still have the much steeper burden of establishing on the merits that PALCO's timber harvesting practices, as opposed to natural atmospheric conditions or other intervening forces, have caused harm or threaten imminent future harm to the coho salmon in the watersheds at issue in violation of section 9.

Because plaintiffs have satisfied each of the elements required for associational standing, the court finds that the organizations have standing to assert their section 9 claim against PALCO.

## II. *Administrative proceedings*

Finally, PALCO argues that the court should dismiss this action under the doctrine of primary jurisdiction. Citing to *Montgomery Environmental Coalition Citizens Coordinating Committee on Friendship Heights v. Washington Suburban Sanitary Comm'n*, 607 F.2d 378, 381–82 (D.C.Cir.1979), and *Friends of Santa Fe v. LAC Minerals Inc.*, 892 F.Supp. 1333 (D.N.M.1995), PALCO maintains that the court should defer to the HCP administrative proceedings currently underway as part of the Headwaters Agreement and "decline to entangle itself in a premature review" of the potential issuance of the ITP allowing PALCO to take coho salmon as part of its timber harvesting operations.

■■■ " 'Primary jurisdiction' . . . comes into play whenever enforcement of the

---

**6.** PALCO again objects to the admissibility of the statements of Mason and Bailey regarding the connection between PALCO's timber harvesting operations and the downstream effects on the coho salmon population and habitat based on

Fed.R.Evid. 702 and 802 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See* Bailey Decl., Ex. 1 to Def. Objections, at ¶ 11.

claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. Western Pacific R.R. Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *Loggerhead Turtle v. County Council of Volusia County, Florida,* 896 F.Supp. 1170, 1177 (M.D.Fla.1995), *rev'd on other grounds,* 148 F.3d 1231, 1246 n. 17 (11th Cir.1998) (doctrine of primary jurisdiction inapplicable to section 9 claim where ITP application pending). In essence, the doctrine of primary jurisdiction allows the court discretion to "refer" to an administrative agency claims which, although properly cognizable before the court, contain some issue within the special competence of the agency. *Reiter v. Cooper,* 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). "There are four factors uniformly present in cases where the doctrine properly is invoked: (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *U.S. v. General Dynamics Corp.,* 828 F.2d 1356, 1362 (9th Cir.1987).

■ Although the court agrees with PALCO's belief that findings made by the FWS and NMFS during the HCP process will affect whether an ITP is ultimately issued to PALCO, the pendency of PALCO's ITP application is not relevant to whether PALCO's timber harvesting operations have resulted or will imminently result in the "take" of coho salmon in the watersheds at issue in this action. *See Loggerhead Turtle,* 896 F.Supp. at 1177. The HCP approval process requires NMFS and FWS to determine the extent of the impact on coho salmon resulting from the issuance of an ITP, whether the steps taken by PALCO to minimize and mitigate such impacts are sufficient, and whether continued logging operations will reduce the likelihood of the survival and recovery of coho salmon. *See* 16 U.S.C. § 1539(a)(2). In contrast, enforcement of the ESA's prohibition against the "take" of en-

dangered or threatened species has been placed squarely within the jurisdiction of the courts through the ESA's citizen-suit provisions. In determining whether a take of coho salmon has occurred or is likely to occur, the court will not be called upon to determine the best strategy for conserving and restoring the coho salmon population in the rivers of northern California. Rather, the court must only decide whether PALCO's logging operations have resulted in a take of or will cause imminent harm to coho salmon in the watersheds at issue. *See Loggerhead Turtle,* 896 F.Supp. at 1177. As noted by the *Loggerhead Turtle* court, there is no "invasion" of the expertise of the Secretary of the Interior and the court need not entangle itself in a premature review of the Secretary's decision to issue an ITP. *See id.*

Moreover, neither *Montgomery* nor *Friends of Santa Fe* compels this court to apply the doctrine of primary jurisdiction here. In *Friends of Santa Fe,* involving a citizen-suit by an environmental group alleging that a "waste pile" deposited by the past and present operators of a gold mine resulted in the drainage of hazardous chemicals in violation of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6992k, the court deferred to pending proceedings undertaken by the state environmental agency under both state and federal law to determine whether discharges from the waste pile posed an imminent and substantial endangerment to health. *Friends of Santa Fe,* 892 F.Supp. at 1337–38. The court based its decision on both the possibility that the defendant mine operators could be subjected to conflicting orders from the court and the state agency and that the court's assessment of whether the discharges would pose a risk to human health or environment would simply "second-guess" the determination of the state agency. *Id.* 892 F.Supp. at 1349–1350. In the instant action, there is no potential for conflicting decisions between the court and the decisions of NMFS and FWS, nor would the court's determination of whether a take has occurred conflict with the Secretary's decision to issue an ITP.

In *Montgomery,* the court dismissed an action brought by an environmental group to enjoin a sanitary commission from allowing excess discharges of pollutants from a sewage treatment plant in violation of the CWA because the Environmental Protection Agency ("EPA") had commenced proceedings to issue a National Pollution Discharge Elimination System ("NPDES") permit. *Montgomery,* 607 F.2d at 381–82. In holding that the administrative proceedings vested primary jurisdiction in the EPA, the court noted that the technical questions in the administrative proceedings and before the court—the appropriate level and quality of the discharge from the sewage treatment plant—were identical. *Id.* The court further stated that the doctrine served the important interests of "allowing the agency to bring its expertise to bear before the court reaches a final decision" and, in some cases, of "avoiding the need for a final decision by the courts altogether." *Id.* Although the issuance of an ITP would ultimately allow PALCO to take coho salmon on some of its lands, the concerns in this action—whether PALCO's past and present logging operations have caused or are causing a take of coho salmon—is quite different from the considerations involved in determining whether an ITP should be issued. *See* 16 U.S.C. § 1539(a)(2).

The court therefore declines to dismiss this action based on the doctrine of primary jurisdiction.

## CONCLUSION

The court hereby DENIES PALCO's motion for summary judgment on the issue of standing and PALCO's motion to dismiss based on the doctrine of primary jurisdiction.

IT IS SO ORDERED.